### W. A. MARTIN V. THE STATE.

No. 10044.   Delivered June 2, 1926.

Rehearing granted State, February 23, 1927.

Rehearing denied Appellant, June 8, 1927.

**1.—Murder—Statement of Facts—Motion to Strike Out—Filed Too Late.**

Where, after a cause has been submitted in this court, the state files a motion to strike out the statement of facts, because there was no duplicate of same presented to the trial court and filed with the clerk thereof, the motion comes too late and will not be considered. If the state desired to raise such objection, same should have been presented before the submission of the case in this court.

**2.—Same—Declarations of Defendant—Improperly Received.**

There was no error in permitting the state to prove threats made by appellant against officers as a class, but it was error to permit the state to prove other statements made by appellant at the same time relating to other offenses committed or charged to have been committed by appellant. But see opinion on rehearing. Following Gilbreath v. State, 41 Tex. Crim. Rep. 567, and other cases cited. Also see Branch's Ann. P. C., Sec. 166, p. 99.

**3.—Same—Flight of Accused—His Right to Explain—Improperly Denied.**

Where the state had introduced evidence showing, and tending to show, flight upon the part of appellant, it was error to refuse to permit him to explain such flight. But see motion for rehearing. Following Arnold v. State, 9 Tex. Crim. App. 414; Ballinger v. State, 63 Tex. Crim. Rep. 657.

#### 4.—Same—Declarations and Acts of Defendant—Properly Admitted.

Where appellant, on his trial for murder of an officer, defended upon the ground of self-defense, the state was properly permitted to prove threats made by appellant against peace officers as a class, and the fact that such threats and acts were embraced within declarations, as to other offenses charged against him, would not affect the admissibility of the entire declaration.

#### 5.—Same—Continued.

The acts and words were res gestae of each other, and both were necessary to express the idea that he was endeavoring to convey to the witness, and to have him transmit to "those damned officers." The threats being relevant on the issue of motive, the manner in which they were made become admissible, although their relation disclosed the commission of another offense. See Wharton's Crim. Ev. 10th Ed., Vol. 2, Secs. 882 and 884.

#### 6. — Same — Declarations and Acts of Defendant — When Self-Serving— Properly Rejected.

Where it was shown that appellant, after the homicide went to his home, in the same city where the homicide occurred, stating "you tell the law I am going home and for them to stay away from there, that I will surrender at the proper time," there was no error in excluding testimony of appellant that he had telephoned from his home to certain persons in Austin and Fort Worth, and the details of his conversations, such testimony being obnoxious to the rule against self-serving and hearsay declarations.

#### 7.—Same—Bill of Exception—Explanation of Flight—Practice on Appeal.

·The right of an accused to explain his flight cannot be questioned, but where a bill of exception complains of the exclusion of his proffered explanation of flight, and the statement of facts discloses that he did testify to the very facts complained of as having been excluded, no error is shown.

#### 8.—Same—Bill of Exceptions, and Statement of Facts—Conflict Between— Rule Stated.

While it is the rule to regard the statements in a bill of exception as true when they are in conflict with the statement of facts, this rule, however, is to be given a rational construction. See Plummer v. State, 86 Tex. Crim. Rep. 493.

#### 9.—Same—Continued.

Where a bill of exception complains of a matter upon which the statement of facts is silent, the bill of exception controls. Where the bill of exception complains of the exclusion of testimony, which the statement of facts discloses was admitted, such bill will be construed in the light of the statement of facts. See Railway v. Pemberton, 106 Texas, 466; Elkins v. State, 101 Tex. Crim. Rep. 377.

#### 10.—Same—No Error Discussed.

On rehearing by appellant, his motion contains certain statements of facts which may be true, but which are not discoverable from the record.

This being a reviewing court only, we are bound by the record which comes before us. No error being discovered in our original opinion, appellant's motion for rehearing is overruled.

APPLICATION TO FILE SECOND MOTION FOR REHEARING.

**11.—Same—Application Denied.**

   Appellant's application for leave to file a second motion for rehearing is denied, the matters presented having been passed upon in our opinion on his motion for rehearing.

Appeal from the Criminal District Court No. 2 of Dallas County. Tried below on a change of venue from Denton County, before the Hon. C. A. Pippen, Judge.

Appeal from a conviction for murder, penalty ninety-nine years in the penitentiary.

The opinion states the case.

*Hughes & Monroe* of Dallas, for appellant.

*Cal Freeman* of Sherman, *Elmer Hooper,* County Attorney of Denton County; *Shelby S. Cox,* District Attorney, Dallas County; *Sam D. Stinson,* State's Attorney, and *Robert M. Lyles,* Assistant State's Attorney, for the State.

BAKER, JUDGE.—The appellant was convicted in the Criminal District Court No. 2 of Dallas County for the offense of murder, and his punishment assessed at ninety-years in the penitentiary.

The record discloses that the appellant was charged by indictment with murdering R. B. Parsons, a deputy sheriff, in Denton County, on the 6th day of August, 1925, and that the venue of said cause was changed to Dallas County.

Brifly stated, it was the contention of the state that the appellant, with malice aforethought and without cause or provocation, shot and killed the deceased, with a pistol, upon the streets of Denton. It was the contention of the appellant, and he so testified and introduced evidence in support thereof, that the deceased had his pistol drawn prior to the time that he, appellant, drew his pistol and began to shoot, and that he killed deceased in his own self-defense.

The attorneys representing the state, in a supplemental brief filed after the submission of this case, and supported by affidavits of the trial judge and district clerk, object to our consideration of the statement of facts filed herein, because there was no duplicate statement of facts presented to the trial court and filed with the clerk thereof. The matters presented in this supplemental brief come entirely too late for our consideration, and if the state desired to raise such objections, same should have been

brought forward, prior to, or upon, the submission of the case, and at a time when the appellant would have been afforded an opportunity to answer the allegation, or correct the alleged defect, if necessary.    There is no contention made that the original statement of facts presented in this court is incorrect, but it is contended that by reason of a failure to file a duplicate copy in the lower court, this court should not consider the original statement of facts filed herein.    To entertain the proposition suggested by the state at this late hour would be to invite the raising of such question even after the disposition of a case by this court, or at any time during the term thereof.    We therefore decline to consider the questions herein presented for the reasons stated.

Bill of exception No. 1 complains of the action of the court in permitting the state's witness, Rayzor, to testify, over appellant's objection, that between the 20th and 25th of June, prior to the killing on August 6th, in a conversation with appellant the latter stated to him, "I understand those sons-of-bitches said I robbed the Krum bank, and I want you to tell them to come and get me."    The witness further testified, "He then displayed another gun.    Then with those two guns, he stuck one of them between my feet and the other in my stomach."    The appellant objected to said testimony upon the grounds that it was an effort upon the part of the state to prove that the defendant was a bad man generally, and an outlaw who would rob banks and carry pistols; and because same was immaterial, threw no light on the killing, and amounted to proof of extraneous crimes and of an assault upon said witness, Rayzor.    The court qualified this bill by stating that in addition to the statement contained in the bill, the witness also testified that the appellant said to him, "If you see any of those damned officers, tell them I am going home and tell them to come and get me.    This is what I am going to smoke them out with."    The court further states, "This constituted a threat against a class, to-wit, officers, and made the testimony admissible."    We are of the opinion that all of said testimony relating to the officers was admissible, but that portion of same to the effect that the appellant stuck one gun between the witness' feet and the other in his stomach was not admissible for any purpose and would only tend to show another and a different crime or offense committed by the appellant upon said witness, which was in no way connected with the homicide. This character of testimony, where it could only show or tend to show that the defendant was a criminal generally, has been held inadmissible by this court in many instances.    See Branch's

Ann. P. C., Sec. 166, p. 99, paragraph 4, citing Gilbraith v. State, 41 Texas 567; Williamson v. State, 13 Tex. Crim. App. 518; McClary v. State, 165 S. W. 572; Gray v. State, 178 S. W. 337, and many other authorities.

Bill of exception No. 2 complains of the action of the court in permitting the witness, Rayzor, to testify to the above conversation with appellant, as set out in bill of exception No. 1, with the exception that bill No. 2 leaves out that part of the testimony relating to the assault by the appellant on said witness, Rayzor. What we have stated relative to bill No. 1 will apply to this bill also, but we might say that the objections raised in bill No. 2 go more to the weight than to the admissibility of the testimony complained of.

By bill No. 3 appellant complains of the refusal of the court to permit him to testify as to why he did not go to the sheriff's office and surrender after the shooting, and why he went home, and to explain his action in refusing to go and surrender, and his reasons for not doing so, to the effect that he believed there was a conspiracy existing between certain peace officers to kill him, and that if he didn't go home and get protection they would kill him; and that he telephoned a State ranger at Austin and the sheriff at Fort Worth, telling them to come to Denton for the purpose of giving him protection; and that he did not leave the scene of the killing with a view of fleeing from justice, but went to his home to await an opportunity to surrender when his life would be protected. This bill further discloses as a certified fact that prior to the time about which the appellant proposed to testify as above set out, the state had introduced several witnesses who "testified to the effect that the defendant had not surrendered after the killing, but left the scene of the killing in an automobile in the opposite direction from the courthouse, and said that he would not surrender and threatened the lives of the officers." The bill further recites and states that the witness, Wallace, in behalf of the state, testified: "After Martin emptied both his pistols he reloaded the pistols. He stepped back, I suppose, four or five steps I suppose and made a little talk; he said, 'My name is W. A. Martin,' and says, 'You laws stay away, don't come down this way.' * * * 'You tell the laws I am going home and for them to stay away from there, that I will surrender at the proper time.' Then he got in his car and drove away." The witness, Hines, according to the bill, testified for the state as follows: "He (Martin) said to some of the men: ' * * * My name is Martin,' and then he looked up the street and said: 'I don't want any of the law to come down here.' He

might have said 'I don't want a damn one of the officers to come down here'."

It will be observed from these statements that the state had introduced evidence showing, and tending to show, flight upon the part of the appellant, and that such testimony was introduced prior to the time when appellant took the witness stand for the purpose of explaining his actions and his intentions in rebuttal of the state's theory of flight. We think the court erred in excluding this testimony. Arnold v. State, 9 Tex. Crim. App. 414; Ballenger v. State, 63 Tex. Crim. Rep. 657, 141 S. W. 91.

In the Arnold case, supra, in passing upon a similar state of facts, wherein the trial court refused to permit the appellant to introduce evidence in explanation of what the state contended was flight, this court, through Judge Hurt, stated: "Under every principle of law and justice, this evidence was admissible; nor was there anything in the objection of the District Attorney 'that the proof must be made by Wright himself.' Defendant had a right to prove it by any competent witness—his wife, or any other person. Indeed, if he had, at the time of leaving, stated it himself, it would have been admissible."

Judge Davidson, in the Ballenger case, supra, and under a similar state of facts, wherein the court refused to admit similar testimony, after citing the Arnold case, supra, and many other authorities, quoted the opinion of the court in the case of Brady v. State, 65 S. W. 521, as follows: "We are of opinion, this evidence was admissible, under the circumstances. The state had proved against appellant, and relied upon, his going under an assumed name as a circumstance against him, in connection with his flight and other matters incident. Wherever one party relies upon a fact, the opposite party has a right to rebut that fact or circumstance. So, in this case, the state having relied upon appellant's flight to Jackson, and his going under an assumed name, and carrying on his business in that way, appellant was certainly entitled to negative any inference suggested by this testimony. If it was not a fact against appellant, the state used it as an adverse fact." Many authorities are cited in support of this doctrine.

For the errors above discussed, we are of the opinion that the judgment of the trial court should be reversed and the cause remanded, and it is accordingly so ordered.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON STATE'S MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—According to the state's theory, supported by several of its witnesses, the appellant killed the deceased Parsons by shooting him a number of times with a pistol. The parties were upon the public square in the city of Denton. The appellant was riding in an automobile. Using an oath, he said to Parsons:

"You sent word you are going to kill me, and I am going to get you first."

Near Parson's body was a pistol, though, according to several of the state's witnesses, he did not have a pistol in his hand at the time he was shot. Appellant used two pistols in doing the shooting.

According to the appellant's testimony, he had received information from several persons to the effect that the sheriff of the county had caused Parsons to come to Denton in order that he might kill the appellant.

In connection with the statement made in the original opinion with reference to bills Nos. 1 and 2 and the explanation by the trial judge, we understand from the bill that the witness Rayzor was at his place of business; that the time was about two weeks after the Krum bank robbery. When the witness was called by the appellant, he had in his hand a pistol which he pointed towards the witness. The latter went out to the appellant's car and a conversation took place. Appellant said he had been to Oklahoma on a fishing trip and had just returned. He said:

"I understand those sons-of-bitches said I robbed the Krum bank, and I want you to tell them to come and get me."

From the witness we quote:

"He then displayed another gun. Then with those two guns, he stuck one of them between my feet and the other in my stomach."

Appellant said further:

"If you see those damned officers, tell them to come and get me. I am going home. If you see any of those damned officers, tell them I am going down home, and tell them to come and get me. This is what I am going to smoke them out with."

The witness said that the appellant had two guns in his hands and was "kind of waving them around."

The learned trial judge, in his qualification, stated that "this constituted a threat against a class, to-wit: Officers, and made the testimony admissible."

From other testimony we gather that the alleged robbery of the Krum bank took place on the 6th of June, and that the homi-

cide occurred on the 6th of August. In his testimony, appellant stated that he understood that he had been indicted in two cases as an accomplice to robbery with firearms, and said that he did not know how many indictments for the offense of robbery were pending against him. Appellant also disclosed by his testimony the fact that there was enmity between him and the Sheriff of Denton County; that the deceased Parsons was a deputy and had been employed by the sheriff to take the life of the appellant. Appellant used two pistols in committing the homicide. According to his testimony and that of some of his witnesses, at the time of the homicide, the deceased had hailed the appellant and was in the act of drawing a pistol.

The defensive theory of the appellant, supported by his testimony and that of some of the witnesses whom he introduced, is self-defense. In meeting this defensive theory and in portraying the appellant's mental attitued towards the officers of the county in which he lived, we do not feel prepared to say that the learned trial judge was wrong in his statement that the acts and words of the appellant, as revealed by bills Nos. 1 and 2, were indicative of a threat against the officers of the county, including the deceased. The rule of evidence is well founded and supported in the declaration that a threat becomes admissible although it does not personate an individual, if it is fairly applicable to a class of persons embracing the deceased. See Wharton's Crim. Ev., 10th Ed., Vol. 2, Sec. 909, note 2.

The episode, as related by Rayzor, does not seem to us to have been an assault. Rayzor's testimony, of course, is controverted by the appellant. Tested by the language and conduct which Rayzor imputed to the appellant, it is believed that there was no grievance shown against Rayzor. Rayzor was selected by the appellant as the person in whom he reposed a threat and was the messenger by whom it was to be conveyed. It appears from Rayzor's testimony that the appellant was unlawfully carrying pistols. The display of the pistols and the use made of them on the occasion, considered in connection with the balance of Rayzor's testimony, impresses the writer as merely a demonstration by the appellant emphasizing and illustrating the meaning of his words. The acts and words were res gestae of each other and both were necessary to express the idea that he was endeavoring to convey to Rayzor and to have him transmit it to "those damned officers." The threats being relevant on the issue of motive (Wharton's Crim Ev., 10th Ed., Vol 2, Secs. 882 and 884), the manner in which they were made became admissible although their relation disclosed the commis-

sion of another offense. A recital of the words which Rayzor imputed to the appellant, without the accompanying acts, would have left his meaning obscure when he said: "This is what I am going to smoke them out with."

In bill of exceptions No. 3, it appears that the following question was propounded:

"Why didn't you go to the sheriff's office and surrender after the shooting?"

A general objection by state's counsel was sustained. Appellant's counsel then propounded the following question:

"Who did you surrender to?"

Objection was made and sustained, though the nature of the objection is not shown. From the bill, however, we take the following quotations:

"In explanation of this bill, it is to be remembered that prior to the time that the defendant took the witness-stand, several witnesses testified to the effect that the defendant had not surrendered after the killing, but left the scene of the killing in an automobile in the opposite direction from the courthouse, and said that he would not surrender and threatened the lives of the officers. Prior to the time that the defendant took the witness-stand, the following testimony was elicited by the state. The witness, F. S. Wallace, a witness for the state, on direct examination, testified in part as follows; (Statement of Facts, 24):

"After Martin emptied both his pistols he reloaded the pistols. He stepped back, I suppose, four or five steps, I suppose, and made a little talk. He said, 'My name is W. A. Martin,' and says, 'You laws stay away; don't come down this way.' * * * Then Martin says: 'You tell the laws I am going home and for them to stay away from there, that I will surrender at the proper time.' Then he got in his car and drove away. * * * It was the same car that I saw him get out of."

R. P. Hines testified on cross-examination (Statement of Facts, page 53) as follows, said testimony being elicited by the state through County Attorney Elbert Hooper of Denton County:

"He (Martin) said to some of the men: 'I want you to come out here and look at this man's gun.' And he said, 'I am not going to hurt any of you.' Says, 'My name is Martin,' and then he looked up the street and said: 'I don't want any of the law to come down here.' He might have said: 'I don't want a damn one of the officers to come down here.' "

"If permitted, the defendant would have testified that he

knew of a conspiracy existing between certain peace officers of Denton County to kill him; that after the homicide he feared that if he did not go home and get protection that he would have been killed, and that the reason he did not go to the sheriff's office was because he knew the officers would not give him a chance but would shoot him on sight.

He would have further testified that the reason he did not surrender to the officers of Denton County and went to his home instead of the courthouse was because he knew he would be shot down without a chance. He would have further testified, and offered to do so, that he phoned for Ranger Captain Tom Hickman at Austin, Texas, and for Sheriff Carl Smith at Fort Worth, Texas, and had a conversation with these men, telling them to come rescue him; that he knew the Denton County officers would murder him and not give him a chance. He would further have testified, as indicated by question propounded to him by his counsel, that he did not surrender to the Denton County Sheriff, but surrendered to Sheriff Schuyler Marshall, Jr., of Dallas County, because his state of mind was such that he believed that Sheriff Fry of Denton County would murder him. He would have further testified that he did not intend to flee from justice, but merely to wait and surrender when his life could be protected."

We understand that in the preparation of the bill of exceptions, counsel for the appellant refers to certain pages of the statement of facts, namely, pages 24 and 53, for the details of the statements which were imputed to the appellant and to which reference is made in the general statement beginning with the words: "In explanation of this bill, etc." An examination of the pages mentioned discloses that the state's witness Wallace and the defendant's witness Hines did give the testimony set out in the bill and that at the same time appellant stated:

"You tell the laws I am going home and for them to stay away from there, that I will surrender at the proper time."

The fact that the appellant had telephoned to certain persons in Austin and Fort Worth and had conversed with them and the details of his conversation was manifestly not responsive to the questions propounded. Moreover, that part of the appellant's proffered testimony to which we have just referred was obnoxious to the rule against self-serving and hearsay declarations, and for that further reason its rejection was not error.

The statements imputed to the appellant in the bill of exceptions were received without objection and were admissible as a part of the res gestæ. If, at the time he made other statements

which would serve to explain, qualify, or interpret the remarks imputed to him, he would, under the law (Art. 728, C. C. P., 1925) have been privileged to have the jury hear the statements related. If the remarks imputed to him, in connection with his acts, were such as to show flight or to indicate to the jury that he was impelled by guilty conscience to avoid arrest, he was, under the law, entitled to give explanatory testimony refuting his intention to flee.

We find in the statement of facts that the appellant gave testimony bearing upon the subject last above mentioned. He testified in substance that he had been told that a man named Johnson had been employed by Fry, Sheriff of Denton County, to kill him; that he had been told by Johnson that he had decided not to kill him (appellant) and that Fry would bring a man named Parsons from Grayson County to kill him; that soon thereafter Parsons arrived in Denton County where he had not previously been a citizen; that he saw Fry point him out to Parsons. He also testified that he had been informed by an ex-sheriff of Denton County that Parsons was going to work for Fry and that he had killed several men, and that Fry had gotten him to kill the appellant; that he warned the appellant against being killed by Parsons at the instance of Fry; that practically the same facts were communicated to him by a man named Simmons and another by the name of Price. He was also told by a man named Shifflet that Johnson had been brought to Denton County to kill the appellant, and Parsons likewise. He said that after he had learned of the conspiracy to kill him, he was fearful that he would be killed by Parsons; that he had heard Parsons make a threat to kill him; that he armed himself with two pistols and a Winchester gun. He testified that after hearing these things and observing Fry point him out to Parsons, he believed that Fry and Parsons had formed a conspiracy to kill him. When asked why he did not report the conspiracy to the sheriff, he said:

"He was the man that hired this man to kill me. What good could I do to tell him?"

We understand from the record that the appellant, after the homicide, went to his home about a half mile from the place where the tragedy occurred and remained there until he surrendered to or was arrested by Schuyler Marshall, Jr., of Dallas County, which took place on the same day. Marshall testified that after his arrival in Denton County he was told by Fry, the sheriff, to "kill Martin and every G—d d—n one of them men;" that Fry further said that Martin had killed his deputy, Parsons,

and for him (Marshall) to "kill Martin and every G—d d—n one in that house." As stated above, the appellant claimed to have committed the homicide in self-defense.

If we comprehend the record, the only two relevant facts which the appellant sought to elicit by the questions propounded, as set out in his bills of exceptions, namely his reason for failing to surrender to the Denton County sheriff, and the name of the person by whom his arrest was made, were put in evidence. It is not specifically stated that Marshall arrested the appellant, but it is made manifest from the testimony that he did so and that he did so at the appellant's home on the day of the homicide. This is not a controverted question. That the appellant believed that the sheriff was a party to a conspiracy to kill him was fully disclosed by his testimony. We will add that we are not impressed with the view that the evidence showed, or tended to show, an intent on the part of the appellant to evade arrest. His declarations at the time were to the contrary. He did make it plain that he was averse to falling into the hands of the sheriff of Denton County. His statement: "You tell the laws I am going home and for them to stay away; that I will surrender at the proper time," in connection with the fact that he did surrender to an officer of another county would seem to refute the theory of escape or flight. It is not thought that in making the analysis above indicated of the statement of facts, violence was done to the practice which has prevailed in this court to regard the statements in a bill of exceptions as true when they are in conflict with the statement of facts. See Briscoe v. State, 27 Tex. Crim. App. 193. This rule, however, is to be given a rational application. Touching it, this court, in the recent case of Plummer v. State, 86 Tex. Crim. Rep. 493, used the following language:

"In a criminal case it is necessary to read the statement of facts to determine the sufficiency of the evidence before an affirmance can be ordered; and touching the practice of this court throughout its history to consider the legal questions presented in the light of the facts, we quote the remarks of a learned law writer: 'The Texas Court of Criminal Appeals always considers the entire record, weighing, analyzing, and thoroughly digesting all the evidence before applying the law to the case in hand.' (Wharton's Crim. Ev., Vol. 1, p. 491, note.)

"Concerning the rules of practice, it was said in substance by Chief Justice Phillips of the Supreme Court that they are not intended to encumber the courts with technical and arbitrary requirements, or to enjoin such rigid adherence to them as pre-

cludes their observance by reasonable and substantial compliance.    (Railway v. Pemberton, 106 Texas, 466.)"

To appraise a bill of exceptions, whether it relates to excluded testimony, or to determine whether from other sources or from the same witness testimony which in substance is the same as that, the exclusion of which is complained of, are matters which this court has always held that it had a right to do, and which right, of necessity, it must have.    To the mind of the writer, in order to invoke the rule the conflict must be a necessary one. As for example, in the case of Elkins v. State, 101 Tex. Crim. Rep. 377, the bill of exceptions showed that certain testimony was given.    The statement of facts upon the subject was silent. We think it was correctly held that the court was bound by the affirmative statement in the bill of exceptions and not by the negative fact that the testimony of which complaint was made, was not embraced in the statement of facts.    So, in the case of Briscoe v. State, supra, the complaint was of a charge given to the jury.    The bill of exceptions showed that the charge was based upon facts not in evidence.    The statement of facts showed the contrary.    There was a necessary conflict, and the court applying the rule was bound by the bill of exceptions.    These, and Plummer's case, supra, are illustrations.

In the present case, two questions are propounded to the appellant.    The objection made to them is not shown but was not sustained by the court.    His ruling must be deemed correct in the absence of a showing to the contrary.    Looking to the statement of facts, we find substantially the same evidence as that which the appellant sought to elicit by the means set out in the bill.    If the appellant had given the testimony which is found in the statement of facts before the ruling complained of was made, the court would have been warranted in refusing to allow the repetition.    If it came in after the ruling was made in the absence of a showing to the contrary, it must be assumed that the court changed his mind.    The fact that the court may make an erroneous ruling in excluding testimony would not necessarily work a reversal if the same fact was afterwards or previously proved.

From what has been said it follows that in the opinion of the writer, the motion for rehearing should be granted, the reversal set aside and the judgment affirmed.

*Affirmed.*

ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—We find in appellant's motion certain statements of fact which may be true but which are not discoverable from the record. This being a reviewing court only we are bound by the record as it comes before us. On account of the averments in the motion we have carefully re-examined the bills of exception which were discussed in our opinion affirming the judgment and also the statement of facts as it relates to the matters complained of in said bills. We are confirmed in the view that proper analysis was made in such opinion of the facts and correct disposition of the case reached. In the judgment of the writer that opinion is exhaustive and leaves nothing further to be said which would not be merely a repetition.

Appellant's motion for rehearing is overruled.

*Overruled.*

ON APPLICATION FOR LEAVE TO FILE SECOND MOTION FOR REHEARING.

LATTIMORE, JUDGE.—We must decline to grant appellant's application for leave to file second motion for rehearing, based on the claim that we have failed to fully discuss and correctly decide his contention in bill of exceptions No. 2. Same relates to general threats against officers. We held same admissible, deceased being an officer, notwithstanding it was made some time before the homicide, and named no officer. Cases named below hold general threats of this character admissible. Threats against officers, "Made repeatedly in the past year," admissible, deceased being an officer. Miller v. State, 31 Tex. Crim. Rep. 609. Threat as follows, "Might want to kill some damn Mexican," admissible, deceased being a Mexican. Mathis v. State, 34 Tex. Crim. Rep. 39. Threat in substance as follows: "If I could find out the man who started the report, would give him six shots in exchange with a six-shooter," held that deceased embraced in the terms used, the killing growing out of a publication of said report. Williams v. State, 40 Tex. Crim. Rep. 501. Threats to kill "All the Striplings," held admissible, deceased being one of the Striplings. Sebastian v. State, 41 Tex. Crim. Rep. 251. Evidence of a threat admissible when of malignant character and embracing deceased. Taylor v. State, 44 Tex. Crim. Rep. 547. See also Anderson v. State, 83 Tex. Crim. Rep. 276; Green v. State, 90 Tex. Crim. Rep. 149; Bridges v. State, 99 Tex. Crim. Rep. 627.

The application is denied.

*Application denied.*