### JOE V. MOORE V. THE STATE.

No. 17167.   Delivered February 27, 1935.
Rehearing Denied April 17, 1935.
Leave to File Second Motion for Rehearing Denied (Without Written Opinion) May 1, 1935.

The opinion states the case.

*R. A. Wilson,* of Amarillo, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, Presiding Judge.—The offense is murder; penalty assessed at confinement in the penitentiary for five years.

It is charged in the first count of the indictment in substance that the appellant, while intoxicated, drove an automobile upon a public street, naming it, in the city of Amarillo, an incorporated city.

The offense is defined in article 802, P. C., 1925. Under article 1149, P. C., a homicide committed in violation of article 802, supra, may be penalized under the law of murder. The matter is discussed in detail in the case of Jones v. State, 75 S. W. (2d) 683. (See motion for rehearing on page 687.)

From the State's evidence, it appears that about noon on the 24th of March, 1934, three children, including Shirley Pauline Palmateer, were sitting on the curb in front of their home on South Arthur Street in the city of Amarillo. Appellant and his companion, Mrs. Daniels, were in an automobile which the appellant was driving on the street mentioned. While going in the proper direction on the side of the street opposite from which the children were sitting, the car suddenly swerved across on the wrong side of the street. In so doing it straddled the curb and went partly upon the curb and sidewalk where the children were sitting and ran over them, each receiving injuries from which injuries Shirley Pauline Palmateer died.

The controverted matter is whether appellant was driving the car while under the influence of intoxicating liquor, as contended by the State or whether the accident was due to the fact that the appellant was rendered incapable of controlling the car due to the use and effect of medicine prescribed and taken at the direction of a physician. Appellant claimed and testified that he was under the influence of a drug known as dial ciba. Some ten or twelve witnesses testified that they were present and saw the appellant and his companion, Mrs. Daniels, immediately after the tragedy, and that the breath of each of them bore strong evidence of the recent use of intoxicating liquor. Several officers who saw the appellant shortly after the homicide and who arrested him, gave the opinion that he was drunk based on his conduct and appearance and to the odor of whisky upon his breath.

It was shown that there was no defect in the car in which appellant and his companion were riding. It was proved that the child was killed by the accident.

Appellant introduced Dr. Langston, a physician, who, according to his testimony, was requested by Miss Slayton, the secretary of the appellant, to visit the latter at the Palo Duro Hotel in Amarillo. According to the doctor, he found that "Joe Moore was awfully sick." After an examination, he gave ap-

pellant some medicine called "dial ciba." It was administered by hypodermic injection into the vein. The doctor said that dial ciba was a synthetic narcotic or a synthetic morphine. It is used as a sedative. Appellant seemed to be in pain and the medicine was given to relieve him. The medicine was in the form of tablets containing a grain and a half. The doctor said there was nothing wrong in giving the medicine, but he thought that appellant took an over dose of it. From the doctor's testimony we quote: "As to the effect of 'dial ciba' on a man, he is more or less numb to all of his pain. He can't articulate. His eyes would be slightly dilated, as if he had had a narcotic, and he can't walk straight, just as if he was drunk. It effects the nerve centers in the brain, as well as the circulation."

The doctor testified that he did not smell anything indicating that appellant was drunk, but he was in intense pain. He said that the conduct of one under the influence of dial ciba was similar to being under the influence of intoxicating liquor. From his testimony we quote as follows: "There are many traits in common. * * * It takes a doctor to tell the difference. There is one symptom or sign that you can always wake a 'drunk' up with, and that is pressure on the supre-orbital nerves. That nerve is just over the eye. Their eyes will flutter, but with drugs they won't do that."

The doctor further testified that it was his experience that a man who was drunk on intoxicating liquor would become sober quickly upon getting a great shock; that a shock would not arouse one under the influence of dial ciba.

Doctor Dutton, a witness for the appellant, testified that he was acquainted with a narcotic called "dial ciba" and its effect upon a human being. He gave testimony in behalf of the appellant in response to hypothetical questions touching the effect upon an individual under certain circumstances when there had been administered the drug called "dial ciba." The doctor's testimony upon direct examination is in substance that the effect of the drug would depend upon the condition of the system of the individual and the amount of drug administered. The doctor stated that the actions of a man under the effect of the drug would be very similar to those of a man under the influence of intoxicating liquor. From the testimony we quote: "A layman would have much difficulty in distinguishing whether or not a man was drunk or under the influence of the drug. I would not say that a dose like that would effect a man to a considerable degree from six to twenty-four hours."

The witness also stated that dial ciba was much used by the

medical profession. He expressed the opinion that one who was drunk would sober up from a shock, whereas the contrary would be the effect of one under the influence of the drug.

Touching the effect upon the system of the drug known as dial ciba, the testimony of Dr. Royce, Dr. Mann, and Dr. Hendricks was similar to that given by Dr. Langston and Dr. Dutton to which reference has been made above.

The testimony of the witness Ruple is in substance as follows: He was acquainted with the appellant and had business with him; that on the morning of the day on which the accident took place, the witness visited the appellant. He first went to his office and finding that appellant was at the hotel, the witness went there. The witness gave testimony to the effect that a doctor came to the appellant's office about ten minutes after the arrival of the witness. Appellant seemed to be in misery. The doctor gave appellant a hypodermic injection in his arm. The witness testified that he sought appellant for the purpose of talking business with him, but due to his suffering, he refrained from any discussion with appellant. The witness testified that he was familiar with the appearance and conduct of people who were drunk; that upon the occasion mentioned the appellant was sober. After giving the hypodermic injection, the doctor left some tablets and told appellant to take them every thirty minutes or thereabouts. The doctor left shortly before the witness departed from the room in which appellant was staying. The witness stated that appellant seemed to be in misery and was suffering from his stomach as though he had indigestion. Appellant bore the appearance of a man who was suffering. The witness had never seen appellant under the influence of intoxicating liquor, although he had seen him take a drink of liquor. He regarded appellant entirely sober on the occasion mentioned. He saw nothing which indicated the contrary.

Appellant testified in substance as follows: He was thirty-one years of age. He had been a resident of Amarillo for seven years. He was self-educated and was a practising lawyer. His family consisted of his wife and a daughter three years of age. On Sunday before the accident, he had been to visit his wife, who stayed at Canyon, where she was attending college. He returned to Amarillo that day and was engaged in work incident to his profession. He disclaimed drinking any intoxicating liquor within a period of ten days preceding the accident, with the exception of one glass of beer some four or five days before the tragedy occurred. Mrs. Bert Daniels was a client of the

appellant. Her husband had died and appellant had been consulted and had given advice in a professional way with reference to the estate. He described his movements from his return to the city of Amarillo and up to the time of the tragedy. During his wife's absence, appellant lived at the Palo Duro Hotel. He had a business appointment with Mrs. Daniels. She came in a car and he accompanied her to the home of a negro woman who had been washing clothes for each of them. The laundry was carried in the car. Appellant described his condition in detail at the time he called in the physician, Doctor Langston, who was a client of the appellant. Appellant had not previously had occasion to call on a doctor. He was suffering when the doctor came and administered a hypodermic injection, the nature of which appellant did not know. The doctor left some tablets which looked something like aspirin tablets in appearance. After the doctor left, appellant took two of the tablets within a short time. He described his trip to the laundry. He testified that on his return from the laundry in Mrs. Daniels' car, (she doing the driving), he became practically unconscious and was unable to recall any of the incidents attending the tragedy. Appellant said the name of his stenographer was Miss Gertrude Slayton.

On cross-examination appellant stated as a reason for his suffering at the time the doctor was called the fact that he had used some indiscretion in eating Mexican food. He had not previously taken medicine of the kind that was administered to him by Doctor Langston and was not familiar with its effect. He took two tablets within thirty minutes after the doctor had given him the hypodermic injection. He had the impression that the medicine he was taking would have the same effect as aspirin, with which he was familiar. The medicine was not labeled.

J. G. Ramsey, sheriff of Roberts County, was called as a witness on behalf of the appellant. His testimony was to the effect that on Monday, March 19, 1934, appellant conducted the trial of a case in court in that county. The witness was familiar with the odor of whisky. He testified that on the occasion of the trial mentioned, appellant appeared entirely free from any effect of intoxicating liquor or any odor thereof.

The witness Logan testified that he and appellant dined together at the Mexican Inn, and that sometime after they had dined, about nine o'clock in the evening before the day of the tragedy, appellant complained of feeling bad; that during the

evening appellant did not drink anything intoxicating. Neither did the witness do so.

Several witnesses, who had known appellant for many years, testified to his good reputation as a law-abiding citizen and for truth and veracity.

Miss Eloise Beale testified on behalf of the State. She described the tragedy in accord with the recitals hereinabove made. She stated that appellant was driving the car; that immediately after the tragedy she saw appellant and he seemed to be intoxicated. She smelled liquor on his breath. The odor was very strong. The witness was recalled and related her conversation with Miss Gertrude Slayton, who was the appellant's secretary. The substance of the conversation was that while the witness was at a drug store she was asked by Miss Slayton if the witness would testify that appellant was not driving the car at the time of the accident. Miss Slayton said: "Of course, you can't be sure that he was driving." The witness also stated that she was positive that the appellant's breath had the odor of whisky; that it was a very strong odor.

Miss Gertrude Slayton testified in behalf of the appellant to the effect that she was his secretary and had been for several years; that Mr. Ruple came to the appellant's office to see him on the day of the tragedy; that appellant was not at his office. She called him at the hotel and was told that Mr. Ruple might come to the hotel to see appellant as the latter was not well enough to come to the office. Appellant also asked the witness to call Dr. Langston to come and see him. She informed Mr. Ruple of the conversation with the appellant. She went to Dr. Langston's office and requested him to go and see the appellant. She also stated that on the same day, after talking to appellant, she talked to Mrs. Daniels. She said that Dr. Langston had been a client of appellant for some time.

Bill of exception Nos. 1 and 2 relate to the ruling of the court in declining to disqualify as jurors C. M. Snow and S. E. Donaldson, who were members of the jury panel. The attack made upon them was that they had read newspaper accounts of the tragedy. Snow had formed no opinion about the case. Donaldson said that he had formed some opinion and that it would take at least some evidence to remove it. The action of the court is not regarded as subject to the objection mentioned. The subject is discussed in Tex. Jur., vol. 26, p. 766, sec. 203, from which we quote: "A juror which concedes that removal of the opinion which he has formed will require some evidence is not thereby disqualified as a matter of law."

It is thought that there was no breach of discretion on the part of the trial judge in refusing to excuse the jurors. However, neither Snow nor Donaldson served on the jury in the present case.

From bill No. 3 at appears that certain photographs were introduced in evidence over the appellant's objection. The photographs purported to show the scene of the accident involved in the case. The complaint is that before the photographs were taken, the sheriff had placed some rocks marking the course of the appellant's car. An examination of the photographs discloses that at points along the sidewalk bordering the street there had been placed a couple of small rocks. The evidence shows that they marked the place where the tragedy occurred. We fail to perceive anything in the matter which would be injurious to the accused or which offends against the practice. The bill is regarded as showing no error. See Tex. Jur., vol. 18, p. 406, sec. 280; Parks v. State, 63 S. W. (2d) 301; Walker v. State, 60 S. W. (2d) 455. Nothing is observed in the record which indicates injury to the appellant by the pictures. The ruling of the judge controls on appeal, in the absence of injury shown. See Clark v. State, 87 Texas Crim. Rep., 107; Hart v. State, 87 Texas Crim. Rep., 55; and other cases collated in Tex. Jur., vol. 18, p. 405, sec. 280, note 16.

Bills Nos. 4 and 5 relates to the testimony of Dr. W. F. Dutton, who qualified as a medical expert and testified touching the hypnotic known as "dial ciba," stating that the effect of the drug was such as would make it difficult for a layman to determine whether one was intoxicated from liquor or was under the influence of the drug mentioned. The witness also stated that a shock would not arouse a victim of dial ciba, whereas a sudden shock would tend to sober up a man who was drunk on liquor. On cross-examination by the district attorney, the doctor was asked the following question: "Doctor, if a man had been drunk, say for about four days, would a shock tend to sober him up a great deal."

The witness finally answered, over objection, that a shock would not tend to sober up a man who had been drinking for a number of days as it would tend to sober up one who had been drinking only shortly. The objection is that the answer of the doctor, last mentioned, being based upon a hypothetical question, was inadmissible. The bill is qualified by the court as follows: "Dutton was a witness for the defendant, and on cross-examination by the district attorney was asked this question: 'Doctor, if a man had been drunk for say

about four days, would a shock tend to sober him up a great deal?' "

Appellant's counsel objected and, in the course of a running comment between counsel and the court, the latter made the remark of which complaint is made. We think no harmful error is shown.

Bill No. 6 complains of the reception in evidence of the testimony to the effect that Mrs. Daniels, the companion of the appellant, was apparently drunk at the time of the tragedy. The witness Campbell testified that he was present and saw the accident or part of it; that he observed appellant driving the automobile and Mrs. Francis Daniels was in the car with him. After they alighted from the car, the witness observed Mrs. Daniels and stated that she appeared to be under the influence of intoxicating liquor; that he smelled her breath which had the odor of whisky upon it. The objection to the testimony showing that Mrs. Daniels was drunk was overruled. The bill upon the subject is qualified by the trial judge as follows: "It is clearly shown without controversy and upon the admission of defendant as a witness that Mrs. Francis Daniels was with defendant in her automobile before and at the time the automobile ran over and killed the child for whose murder defendant was being prosecuted. Her conduct and behavior and acts and condition was, in my opinion, res gestae of the said offense and act and condition of defendant and was, in my opinion, therefore admissible and for that reason the testimony complained of in this bill was admissible."

From Bill No. 7 it appears that the witness R. C. Hill saw the tragedy and also saw Mrs. Daniels who was in the car at the time of the accident. The witness detailed the conduct of the appellant, and testified as follows: "I took the little boy in my arms and walked back to the car and asked the lady if I could use the car to take the child to the hospital, and I thought Mr. Moore was going to drive, and I said, 'He is not in any condition to drive,' and she said, 'I will drive,' and I said, 'I will get the child,' and she got out of the car and followed me, and when I got ready to go I raised up and she was standing at the side of me, and I noticed something was wrong and she was kind of staggering."

Over objection of the appellant, the witness testified further: "I seen she wasn't in any condition to drive, and I asked her if she would let me drive the car, and she said, 'No, I will drive,' and I said, 'No, I don't need your car.' "

The bill is qualified as follows: "Under the recitations in

this bill and the evidence clearly all the acts and words and condition of Mrs. Daniels (who was in her car with defendant which he was driving when the child was killed) was, in my opinion, res gestae of the transaction for which defendant was on trial and therefore admissible. They were together and 'acting together' when the homicide occurred and all each did and their condition was admissible as res gestae, and the evidence complained of was admitted for that reason."

Considered in the light of the record as presented by the appellant, the acts, condition and conduct of Mrs. Daniels at the time of the tragedy cannot be eliminated as part of the occurrence. From the appellant's testimony, it appears that he and Mrs. Daniels went together in her car to the laundry. The tragedy occurred upon their return from the laundry. The appellant's testimony is to the effect that he remembered very little that happened after reaching the laundry. From the appellant's testimony we quote: "I recall that she (Mrs. Daniels) asked me if I had the telegram. * * * I told her that I did, and I don't recall anything else that happened until I was up here in this jail the next day. I have no idea who was driving the car when we left down there. I don't know which way we came from down over to South Arthur Street. I don't know who was driving the car at the time the children were struck. I don't recall of talking to Mr. King out there when he arrested me. I don't recall seeing the children. I don't recall anything at all until I was in jail the next day. I had not at any time that day taken a drink of intoxicants of any kind."

Bill No. 8 complains of the testimony of R. C. Hill, who testified as a witness for the State. Preliminary to his testifying, the appellant drew from the witness the fact that in 1926, in the 47th District Court of Potter County, he was given a five years suspended sentence. Upon such admission by the witness, the appellant contended that he was not a competent witness and objected to his testimony. The court overruled the objection. According to the appellant, the action of the court in permitting the witness to testify is made the subject of complaint in the bill. It seems that in overruling the objection, the court states that there had never been a final judgment, and that Hill had never been convicted. If understood, the complaint is because of the fact that the court made a statement to the effect that the sentence had never become final. Hill's testimony was to the effect that he was an eye-witness to the tragedy; that after the accident appellant got out of the car; that the witness took hold of appellant's arm and asked where

he was going; that appellant merely grunted. The witness picked up the little boy who was injured. Appellant leaned over the shoulder of the witness, started crying and said that he was sorry. The witness asked Mrs. Daniels if he could use her car and take the child to the hospital. Thinking that appellant was going to drive, the witness remarked that appellant was not in a condition to drive. The witness noticed that Mrs. Daniels was staggering. The testimony of the witness Hill seems to have been cumulative so far as we are able to appraise the bill. No error is shown. Article 780, C. C. P., forbids proof of suspended sentence after it has been set aside.

Bill No. 9 relates to the testimony of Mrs. L. A. Walker, who testified that she observed the physical condition of the appellant and Mrs. Daniels at the scene of the accident and that they were both drunk. The witness testified: "The reason I say they were both drunk is because I smelled their breath. I smelled Mr. Moore's breath. I smelled the odor of whisky on his breath. I smelled Mrs. Daniels' breath. As to what other reasons I have to give the jury for saying that they were both drunk—well, they were just both drunk. Mr. Moore was reeling. * * * He couldn't walk straight."

The evidence that the breath of both appellant and Mrs. Daniels indicated that they had been drinking whisky was cumulative. However, the point made in the bill is that the testimony as to the condition of Mrs. Daniels was irrelevant and immaterial. The bill is qualified with the following statement:

"Under the circumstances shown in the bill and clearly shown in the evidence and the admissions of the defendant as a witness, he and Mrs. Daniels were together in her automobile, which he was driving, before and when it ran over and killed the child for which death defendant was prosecuted for murder, and the condition and acts and deeds and words of each of them was, in my opinion, res gestae of the entire transaction and of the offense and act of killing the child."

With reference to bill of exception No. 10, the following statements are made: Miss Eloise Beale was called as a witness on behalf of the State. Her testimony was inculpatory of the appellant and more fully appears in the body of this opinion. Subsequently, Miss Gertrude Slayton was called as a witness for the appellant and gave testimony (heretofore stated in this opinion) tending to support the appellant's theory of innocence. While on the witness stand Miss Slayton was ques-

tioned upon behalf of the State, on which hearing her testimony was as follows:

"I did not ask Miss Beale to come up here and swear that Mr. Moore was not drunk down there on the occasion that he hit this child. As to whether I have talked to Eloise Beale on any other occasion about the facts of this case, well, I haven't particularly discussed the case, no. I have not at any time, even right up to this minute, ever said anything to Eloise Beale or asked Eloise Beale to come up here and testify in this trial that Mr. Moore was not intoxicated or was not drunk down there on the occasion when some Palmateer children were injured. * * * As to whether or not, when we got down to the Randall Drug Store, I asked her and requested her, when she came down to testify, to testify that she did not see him driving that car—well, I asked her if he was driving the car, and she said she thought he was, and I didn't tell her to say he was not. I did not ask her or request her to come down here and testify that Mr. Moore was not driving the car. I did not ask her to state in her testimony here that she did not believe he was drunk. I did not ask her to say that he was not drunk."

Thereafter, Miss Beale was recalled as a witness for the State and gave testimony touching her conversation with Miss Slayton as follows: "She asked me at the drug store if I would get on the witness stand and say that Joe Moore was not driving the car. She did not say anything else to me with reference to whether or not he was intoxicated. That is all she asked me. She simply asked me to testify that he wasn't driving, and also she said, 'Of course, you can't be sure that he was driving.'"

The complaint is based upon two subjects; first, the testimony of Miss Beale to the effect that Miss Slayton had requested her to testify that appellant was not drunk at the time of the accident; and second, Miss Beale's testimony that she was requested by Miss Slayton to testify that appellant was not driving the car. As shown in the bill, Miss Beale testified that Miss Slayton had requested her to state that appellant was not driving the car, but did not state anything with reference to whether he was intoxicated. The predicate, as set out in the bill, was to the effect that the only request made by Miss Slayton of Miss Beale was that quoted above with reference to appellant not driving the car, but nothing was said as to his not being intoxicated. We observe in the statement of facts that Miss Slayton was interrogated by appellant's counsel on both subjects, that is, with reference to appellant not driving

the car and also with reference to his not being drunk. That is to say, the bill of exception as drawn is in conflict with the evidence. Miss Slayton having been introduced by the appellant in his own behalf and having testified as above stated, the complaint that there was no predicate laid is not regarded as tenable against the State's case. This announcement is based upon an examination of the various precedents, among which are the following: Cockrell v. State, 60 Texas Crim. Rep., 124; Burnaman v. State, 70 Texas Crim. Rep., 361; Mitchell v. State, 87 Texas Crim. Rep., 530; Pace v. State, 69 Texas Crim. Rep., 27; 15 Amer. Law Rep., 504, note; Ruling case Law, vol. 28, p. 617. The statement of facts clearly shows that the witness testified touching both of the matters in issue in the bill, while the bill embraces but one subject. Under such circumstances, it was competent to look to the statement of facts as well as to the bill of exception. Ordinarily, on the conflict between the statement of facts and a bill of exception, the presumption is in favor of the announcement in the bill of exception. See Elkins v. State, 101 Texas Crim. Rep., 377. Such is not the rule under all circumstances. It has been said that when a bill of exception complains of a matter upon which the statement of facts is silent, the bill of exception controls; also, that when the bill of exception complains of the exclusion of testimony which the statement of facts discloses was admitted, such bill may be considered in the light of the statement of facts. See Railway v. Pemberton, 106 Texas Rep., 463; Elkins v. State, supra; Martin v. State, 107 Texas Crim. Rep., 151; Plummer v. State, 86 Texas Crim. Rep., 493. However, reliance upon the matter last stated is not regarded as essential in the present instance.

Nothing in the rulings of the trial court upon the questions of procedure raised by the record is regarded such as to require or authorize this court to reverse the judgment.

Touching the evidence, the conflicting theories as to the cause of the tragedy and the condition of the parties present a matter which under the law of the state it was the duty of the jury to decide, and their finding in favor of the State is binding upon this court.

We are therefore constrained to order an affirmance of the judgment of conviction. It is so ordered.

*Affirmed.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant bases his motion for rehear-

ing and oral argument chiefly on the proposition that we misapprehended his bill of exception number four; and in our discussion treated it in connection with bill number five. Number four related to a question asked by the district attorney, and number five to a remark of the trial judge at the time he overruled appellant's objection.

As stated in our original opinion, the issue was whether appellant's condition at the time of the unfortunate killing of the child was due to intoxication or to the effect of a narcotic. Witnesses who came in contact with appellant at the scene of the accident and immediately thereafter testified that the odor of whisky on appellant's breath was noticeable. On direct examination appellant developed from Dr. Mann, one of his own witnesses, the following testimony: "As to whether it is hard to distinguish whether or not a man is intoxicated by the use of liquor or is under the influence of dial ciba—well, there wouldn't be any smell of liquor when he is under the influence of dial. When he is under the influence of dial there wouldn't be any smell of liquor on his breath. His manner of locomotion, and other manners, would be practically the same, only if left alone the patient would drop into a deep slumber. As to what my experience is with a drunk man having a severe shock with reference to sobering him up—well, as a rule, it sobers them up right now, but with dial ciba they sleep right on."

Other physicians testified in substance as did Dr. Mann with reference to the similarity of the actions of one who was drunk and one who was under the influence of the narcotic named, except they were not questioned regarding the odor of liquor on the breath. Officers who had charge of appellant after the accident testified that he did not "sober up or come to his senses for a considerable period of time after the accident." To save repetition we refer to our original opinion for the statement of what is shown in bill number four. The qualification mentioned in said opinion relates to bill number five. Appellant objected to the question asked Dr. Dutton on cross-examination on the ground that it was a hypothetical question not supported by any evidence in the record. Over objection the witness answered that one who had been drunk for four days would not respond to a shock as readily as one recently intoxicated. If the question was hypothetical, and not proper, we have not been able to reach the conclusion that it was followed by the harmful consequences claimed by appellant. Taking into consideration the officer's testimony in connection with that of the

physicians, the answer of the doctor to the question objected to appears to have been favorable to appellant. That is to say, if the jury accepted appellant's testimony and that of his witnesses to the effect that he had not been drinking intoxicating liquor on the days previous to the accident, and that one intoxicated would respond to a shock when one under the influence of the narcotic would not so respond, then it would appear to follow that a failure to respond to the shock would be favorable to appellant's contention that he was under the influence of the drug. It is not likely the jury confused the question with the proven facts as certified in the bill.

We note that a somewhat similar occurrence came into the record without objection. Dr. Royce, the city and county health officer, was called as a witness by appellant. He testified that a day or two after the accident he saw appellant in jail and examined him, and found that his stomach was distended with gas—that he was suffering from gastritis in an acute attack —commonly known as indigestion. On cross-examination the witness testified: "People who have been drinking intoxicating liquor, or what is commonly called bootleg liquor, for several days will sometimes have a severe attack of indigestion and if you have been drinking it for some little time it sure as the world will. As to whether it is a fact as to what we call ordinary bootleg whisky will upset a man's stomach pretty badly—well, any whisky drunk over a long period of time will cause you to have indigestion or a gastric upset."

Considering the entire record we are not impressed that the incident complained of in bill of exception number four presents reversible error.

We believe the questions raised by bills of exception numbers eleven and thirteen were correctly disposed of originally, and that no further discussion is called for.

The motion for rehearing is overruled.

*Overruled.*