## L. M. PARKS v. THE STATE.

No. 16004.   Delivered May 24, 1933.
Rehearing Denied October 4, 1933.
Reported in 63 S. W. (2d) 301.

The opinion states the case.

*Kirby, King & Overshiner,* of Abilene, for appellant.

*George H. Mahon,* District Attorney, of Colorado, Texas, *George W. Outlaw,* County Attorney, *James H. Beall, Jr.,* and *B. M. Neblett,* all of Sweetwater, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, confinement in the penitentiary for twenty-five years.

Appellant stands convicted of drowning his wife in Lake Trammell near Sweetwater, Texas, on July 8, 1932. Some time during the year 1929 appellant met Fay Condit, a prostitute living at Hazel Wood's place in the town of Sweetwater. From then until the death of his wife Fay Condit was appellant's

paramour. In September, 1931, Fay Condit left Hazel's place and took up her residence in a hotel in Sweetwater, where she lived until June, 1932. During her stay at the hotel, she bought an automobile, appellant furnishing money to pay some of the installments on the car. Appellant paid her room rent and board, and bought her an insurance policy. Apparently he furnished her money whenever she asked for it. At times she went to her home in Oklahoma, and, on these occasions, appellant gave her money. She and appellant consistently corresponded with each other. All of the testimony on the part of the state reveals a growing infatuation on the part of appellant for Fay Condit.

At the time of the death of his wife appellant was in need of money. He was working on a commission basis for the Dr. Pepper Company, earning from twenty-five to forty dollars per week, and had only been employed by the company for four months. During that four months he had gotten behind with his employer approximately $235.00, which amount he was unable to pay. A loan on his home was delinquent. Notwithstanding his bad financial condition, between June 3, 1932, and July 2nd of the same year, appellant took out in various mutual insurance associations policies aggregating $14,000 on the life of his wife, payable to himself as beneficiary. Prior to securing these policies, appellant had policies on the life of his wife aggregating $4,000. None of the companies required a medical examination. According to the state's testimony, appellant signed his wife's name to all of the applications for insurance. Prior to taking out these insurance policies, appellant wrote two letters to insurance associations. In one of these letters he made the statement that he and his wife had been forced to give up some old line insurance. In addition to the policies carried on the life of his wife, appellant carried insurance upon himself and children. One of the policies on his own life was payable to Fay Condit.

On June 29, 1932, Fay Condit left Sweetwater and went to Oklahoma, appellant furnishing her the money for the trip. She was in Oklahoma at the time appellant's wife was drowned. On July 7, 1932, appellant took his wife and children fishing. On this occasion they visited several places on Lake Trammell, but caught no fish. On the next day, only six days after appellant had taken out the last policy on the life of his wife, he, his wife and two little girls again drove to Lake Trammell. After stopping at the lake house to borrow some poles and secure bait, appellant drove his car directly to the scene of the drown-

ing, a place two and one-half miles up the lake, over a road shown by testimony to be difficult to travel. The car was left about 330 feet from the point where his wife was drowned; the state's testimony being to the effect that the car could have been driven nearer said point. The point to which appellant and deceased went could not be seen from the car. Appellant and deceased told their two small children to remain at the car, as it was too warm for them to fish.

Touching the circumstances immediately attendant upon the drowning, appellant's nine year old daughter (being the older of the two children) testified that she and her little sister did not go down to the lake to fish. She said that while they were sitting in the car she heard a splashing in the water and heard their mother scream; that their father was down at the lake with their mother at the time they heard this splashing; that they jumped out of the car and ran down there; that when they got down there they saw their mother in the water; and she was trying to get out; that she cried "Help" twice; that they could see their mother plainly and could also see their father; that he was standing there; that when they heard the splashing in the water their father was down at the lake where their mother was; that he did not jump in the water; that they left their mother and went with their father to get help. On cross-examination the little girl testified, in answer to leading questions, that her father was within five feet of the car where she and her sister were sitting when they heard the splashing. Upon both direct and cross-examination, however, she maintained that she saw her mother in the water struggling and crying for help.

Leaving the scene of the drowning, appellant drove his automobile past the home of one Tebe Scott, which was only 150 yards from the road which he was traveling, and only about half a mile from the scene of the drowning; the house being in plain view of the road. In front of the house was a field, which was in plain view, and in this field three men were working. Instead of stopping at this house, appellant drove approximately another half a mile to a point on the lake where he found Harold Reid and Archie Wright fishing, and there he first made known to outsiders the fact that his wife was in the water. Appellant appeared to be excited. Leaving his two little girls with Archie Wright, with instructions to take them to the lake-house, appellant took Reid to the scene of the drowning, he driving the car. He drove approximately 25 miles an hour, notwithstanding the fact that it was possible to drive faster

by slowing down at rough places. On the way back to the scene of the drowning appellant told Reid that his wife had fallen into the deep water. When they got to the place he pointed out the place where his wife had fallen in. A fishing pole with a line on it was out in the water at this point. A fishing pole was on the bank back of the place where his wife had been fishing. Appellant told Reid that he could not swim. On the trial, every witness testifying concerning appellant's ability in this regard said that he could swim; one of the witnesses testifying that he had seen appellant swim across a tank, and had seen him swim in water over his head. Some of the witnesses for appellant, although admitting that he could swim, said he was a poor swimmer. After reaching the scene of the drowning, appellant told Reid that he was going into the water after his wife. Believing appellant could not swim, Reid became excited and insisted that appellant stay out of the water. Reid weighed 150 pounds and appellant was a large man, being over six feet tall and weighing about 200 pounds. Reid prevented appellant from going into the water. In one of the leading questions propounded to the little daughter of appellant, counsel for appellant elicited the fact that appellant reached out his hand toward her mother when she was in the water. This was the only evidence that appellant made any effort to rescue his wife.

Appellant told Reid that he had left his wife fishing and started back to the car to fix the children's poles up so they could fish; that one of the little girls had started down to the lake when she heard her mother scream; that when he ran to the lake his wife was gone; that all he could see was bubbles. The uncontroverted evidence was to the effect that the two fishing poles which were left at the car for the children already had lines rigged up on them and wound around the poles. Witness McBurnett testified that appellant said to him: "He was down the lake a little ways seeing about some poles that he had set out there,—he said he heard a scream and ran back up there and when he got there all he could see was some bubbles." A physician testified that appellant said: "He was back up to his car helping the children fix up some fishing poles at the time she fell in. * * * He told me that the children had heard their mother scream, but that he had not heard her; he said they rushed down to the water and found no trace of her." The witness Scott testified to appellant's declaration to him, as follows: "He said she was fishing right here and pointed out the place to me * * *. He said he went up to the car and when he returned he couldn't see nothing of her. All I could see was

her fishing pole, he said, and that was all I could see." These self-conflicting statements of appellant were also in direct conflict with the testimony of his little daughter. The body of appellant's wife was found at the spot where he said it would be found.

After the body of deceased had been taken from the water, appellant asked: "How long can a body stay in the water and still be revived?" He also asked the attending physician if there was any chance of reviving his wife. The reply was that there was no particular time for "quiting" drowning cases. Appellant then told the doctor to use his own judgment as to when to stop his efforts to restore life. After the body had been removed from the water appellant did not go near it. On the way back to town he passed the lake-house where his two little girls were staying, but did not go in to comfort them and did not visit them until about ten o'clock the next morning, when they were brought to his home. On the day after his wife was buried, appellant wrote a letter to Fay Condit, which was in part as follows: "Of course I am so lonely for you today. * * * There are so many things that I need to discuss with you, sweet. I need your advice which I know you would give so willingly. When I see you I want you to tell me everything as you see it. After I tell you plans for the future * * * Hugs and kisses a gillion. Your Luke." While being questioned by the district attorney concerning the drowning of his wife, appellant attempted to destroy a love letter he had received from Fay Condit.

Appellant did not testify in his own behalf, but introduced witnesses who testified that his wife was subject to dizzy spells, thus suggesting that deceased had accidentally fallen into the water and drowned. He also introduced witnesses who testified that, on the day of the drowning, appellant had asked them to go fishing with his wife and him.

In rebuttal the state offered proof to the effect that the location at which deceased was fishing was not a dangerous one. There was an underwater ledge at said point where deceased was fishing. At its narrowest point this ledge was approximately 3.8 feet wide and at its widest point about 5 feet wide. One could wade out on this ledge, the proof being to the effect that one falling from the knoll where deceased was fishing would have first fallen on the ledge. The body of deceased was in the deep water beyond the ledge. The position of the state, given support by the circumstances, was that it would have been necessary to have leaped out over the underwater ledge,

or have been pushed over it, in order to reach the place in the deep water where the body of deceased was recovered. Appellant meets this with the proposition that one drowning would more than likely flounder into the deep water.

It is urged that the circumstances are insufficient to meet the demand of the law. The facts showed either an accidental drowning or an intentional drowning by appellant. It seems to us that the circumstances taken together lead irresistibly to the conclusion that the drowning resulted from the criminal agency of appellant, and exclude every other reasonable hypothesis except that of appellant's guilt. See West et al. v. State, 34 S. W. (2d) 253.

There are four bills of exception in the record. In bill No. 1 it is shown that the state proved by the witness Moreland that appellant worked for him on a commission basis and that appellant's income was from twenty-five to forty dollars a week; and, further, that when appellant left his employment he (appellant) owed him $236.88, for which he gave him his note. This testimony was objected to principally on the ground that it did not establish motive and shed no light on the question as to whether appellant drowned his wife. Bill of exception No. 2 relates to proof on the part of the state that appellant owed a note on his home, which was several months past due. The same objection was interposed to this testimony as disclosed by bill of exception No. 1. We think the objections were properly overruled. The fact that appellant was in bad financial condition was a matter of material inquiry. He had taken out a large amount of insurance on the life of his wife, payable to himself. The proof in question tended to show motive.

Bill of exception No. 3 brings forward objection to the introduction in evidence by the state of a letter written by appellant to Fay Condit the day after his wife was buried. This letter was shown beyond dispute to have been written by appellant and was identified by Fay Condit prior to the time it was introduced. It was a love letter in which appellant expressed his desire to see his paramour and talk over his plans for the future with her. The letter was clearly admissible.

As shown in bill of exception No. 4, while appellant was under arrest and after he had been questioned by the district attorney concerning the drowning of his wife, he tore up a letter and threw it into the waste basket. Securing the pieces, the district attorney placed them in order and discovered that the letter was a love letter from Fay Condit to appellant. Proof was made of appellant's action in destroying the letter, and the

letter itself was introduced in evidence. Appellant objected on the ground that article 727, C. C. P., relating to confessions made while under arrest, had not been complied with. We think the objection was properly overruled. We quote from Underhill's Criminal Evidence, Third Edition, sec. 163, as follows: "Thus it may be shown that he attempted to escape, or fled from justice or that he destroyed evidence or endeavored to fabricate evidence. Such facts may, with correctness, be assumed to form a part of the res gestae, though not contemporaneous with the principal transaction."

In Kelly v. State, 102 Texas Crim. Rep., 395, a situation similar to that under consideration arose. The accused had been arrested and was being taken to jail. While enroute to jail in an automobile he seized a pair of pliers and broke one of the fruit jars containing the whisky. The trial court permitted the state to prove the act of the accused over his objection that he was under arrest. We held that the objection was not tenable, and said that it would be a remarkable situation if an accused should be permitted to destroy the evidence against him, and the state be denied the right to prove such destruction because he was under arrest at the time. The conclusion was reached that the fact that the accused was under arrest afforded no reason for refusing the testimony that he destroyed the evidence. See, also, Funston v. State, 38 S. W. (2d) 335. Appellant cites Hill v. State, 95 Texas Crim. Rep., 500, 255 S. W., 433. In that case the accused was on trial for transporting intoxicating liquor. There was a sharp issue as to whether the liquid found in possession of the accused was whisky. After being placed in jail, the appellant being very cold, grabbed up the jar of liquid the officers had taken from him and drank about half of its contents. In holding proof of this act of the appellant inadmissible, we said: "Proof that appellant seized the jar and drank part of its contents being an act done when under arrest, not res gestae, and which tended to show guilt, was improperly received." We did not have it in mind at all that this was an attempt on the part of the accused to destroy the evidence, but rather that it was an act of his tantamount to an affirmation that the contents of the jar was whisky. If the testimony had been offered as admissible because it was an effort to destroy testimony, a different rule would have been applicable, and we would have held the testimony admissible.

Finding no error in the record, the judgment will be affirmed.

*Affirmed.*

ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—In the argument and motion for rehearing the contention is made that the corpus delicti is not proved. The necessity for such proof is fundamental. See Tex. Jur., vol. 12, p. 270, sec. 42. That the proof may be made by circumstantial evidence is not open to serious question. See Harris v. State, 28 Texas App., 308, and many other cases collated in Tex. Jur., supra, p. 271. See, also, Tex. Jur., vol. 22, pp. 386-387. The identification of the body of the alleged deceased is an essential prerequisite to the conviction of homicide. The statute so declares. Article 1204, P. C., 1925. See, also, Kugadt v. State, 38 Texas Crim. Rep., 681; West v. State, 34 S. W. (2d) 253.

We are referred by appellant's counsel to a great number of decisions, all of which have been examined. In several of them alleged drowning is dealt with.

Walker's case, 14 Texas App., 609, was reversed for the reason that the body of the alleged deceased was not identified; nor was it shown that the individual charged to have been murdered was in fact dead. The proof showed only that he had disappeared.

Hunter's case, 34 Texas Crim. Rep., 599, is in the same class as the Walker case. The body of the deceased Daves was not identified. He was not shown to have been dead. Moreover, the instruction upon the subject of the corpus delicti was not properly framed.

Follis' case, 51 Texas Crim. Rep., 186, is like the Hunter case. Follis confessed that he had killed one McDonald. Some time after the disappearance of McDonald a dead body was found in a stream. It was not identified as that of McDonald. Although McDonald had disappeared, there was no specific evidence save the confession of Follis that McDonald was killed. Moreover, the procedure was not in accord with the law.

The case of Porter v. State, 86 Texas Crim. Rep., 23, is one of unusual circumstances in which four judges of this court wrote opinions. It happened that the judge who wrote the original opinion retired and his successor qualified before final decision of the case. Three of the judges concurred in the affirmance. Presiding Judge Davidson, however, dissented upon the ground that the evidence did not meet the measure required in showing death by violence. Moreover, the procedure was criticized in his opinion.

With the exception of the Porter case, to which reference has just been made, we find in none of the cases cited by the

appellant any matter that would aid in the solution of the vital question involved in the present appeal, namely, whether the death of the deceased was due to accident or to the criminal act of the appellant. In view of the nature of the case, however, we have made a rather extended summary of the testimony of some of the witnesses.

By Doctòr Rosebrough it was shown that he examined the body of Mrs. Parks and after his examination reached and stated the conclusion that she was drowned. A conversation took place between the doctor and the appellant in which the latter stated that his wife had been suffering from dizzy spells; that he was not present when she fell into the water but had gone to the car to help the children fix their fishing poles; that the children heard their mother scream, but he did not hear her; that he rushed to the water and found no trace of her; that he did not see her in the water. The appellant was very nerv-ous and the doctor twice administered sedatives to quiet the nerves. Appellant said that he left his wife fishing on the bank of the lake while he went to fix the children's fishing tackle. As understood by the doctor, the appellant declared that he heard his wife scream after he got to the car; that he reached the car before she screamed; that he and the children rushed to the water's edge but failed to see her.

Harold Reid testified that he and Archie Wright were fishing at Lake Trammell and saw the appellant and his family there; that appellant came to them for help after the tragedy. Appellant was very much excited and kept saying, "My wife, my wife." Reid asked, "Where is she?" Appellant replied, "She is down there in the water." Wright took the little girls with him to the car. Reid and the appellant went to the scene of the drowning in the latter's car. Appellant said something about his wife falling in deep water; that she was gone. The witness did not recall whether appellant said he saw her fall. Reid ran to the water's edge and asked where she had fallen in. Appellant said, "Right along here," pointing to the spot where there was a fishing pole lying out in the water. Another fishing pole was lying parallel with the bank approximately at the same place where appellant claimed his wife was fishing. In returning to the lake appellant drove the car at the rate of twenty-five miles an hour, athough the car could run faster. When they reached the water appellant said: "Boy, we can't get her out of there; take off your shoes and go in for her." Reid told appellant that it would be necessary to get some help; that the water was deep and that it would be impossible for the witness

to get the body out. Appellant became very much excited and said, "If you are not going in after her, I will." In that connection appellant mentioned the fact that he could not swim. Reid grabbed the appellant and said, "You can't go in there; use a little sense; you will drown the same as your wife." The witness managed to keep the appellant from going in the water. While they were looking for the body, appellant seemed pretty much worked up over the matter. From the witness we quote: "He would say that he had been back up to the car to fix the poles for the little girls, and had left his wife down there fishing and said that the little girl had started down toward the bank and had heard a scream. He said that that was the first time that he knew anything was wrong. When he ran down there she was gone and all that he could see was the bubbles."

Appellant showed the witness where the car was located at the time they stopped to fish at the lake. The distance was about 100 yards from the water. He pointed out to Reid where he had left his wife fishing. The topography of the country was too broken to drive down. Appellant said he did not know just where his wife fell into the water, but showed the witness where he had left her. Appellant said that when he went to the car to fix the girls' fishing poles he left his wife fishing, and that when he returned to the lake she was gone; that when he and the little girls started down to where the deceased was fishing, he heard one of the girls scream and he ran down there. Reid was fishing about a mile from the place of the tragedy.

McBurnett went to the lake from his home to help in getting the body out of the water. He was about two and one-half miles from the place of the tragedy, that is, in traveling on the road. He rode in the car driven by the appellant and had some conversation with him. Appellant remarked that a person named Hopkins had drowned there a year before. The witness said that Hopkins had epileptic spells and asked appellant if his wife ever had anything like that. Appellant replied that if she had anything like that he did not know about it. Appellant told the witness that he was down the lake a little ways seeing about some poles that he had set out; that he heard a scream and ran back up there; that when he got there all he could see was some bubbles. The only other statement which the witness remembered appellant having made was, "If you dive and find her, don't try to bring her up by yourself." Appellant pointed out the place where he last saw his wife. Right at the water there was a bluff about eighteen inches from the water. "It ran north and then got wider and then narrower again." A little

ledge of rock was covered by water, and the water was deep right up to the ledge of the rock. The ledge of the rock extended out in the water about three feet. The bank of the lake at the place of the drowning was about eighteen inches high. When the witness spoke of the bluff, he meant the eighteen-inch drop-off. On cross-examination McBurnett said that appellant had two poles set out and that he had his car back up on the hill; that the car was parked about 110 steps from the place where the deceased was last seen.

L. B. Scott went to the lake for the purpose of assisting in recovering the body of Mrs. Parks. Appellant appeared to be very nervous. He told the witness that he was fishing and went up to the car; that when he returned he could see nothing of his wife. All that he could see was her fishing pole. The witness said that in endeavoring to ascertain the locality of the body so that he might dive for it, he observed on the edge of the rock where Mrs. Parks was fishing a little gravel knoll about eighteen inches off the edge of the bluff. There was a knee print in the gravel. The witness said that appellant seemed very much grief stricken. He asked the witness how long a body could stay in the water and later be revived.

A. H. Hutchins said that he had sold appellant a permit and some minnows on the afternoon before the tragedy, which was the first time he had seen him. When Hutchins reached the scene of the drowning, he saw several others there. The body had not been recovered at the time. Hutchins asked appellant if he knew that his wife was in the water, to which he replied that she was, although he had not seen her fall in the lake. Hutchins said: "Well, maybe she is not in the lake." Appellant replied: "Yes, she is in the lake." Appellant said that he went up to fix the children's poles to fish with and that when he got back he saw the water bubbling. Hutchins asked appellant if his wife had fainting spells. He replied, "No, she didn't have fainting spells." Appellant pointed out the place where he claimed to have seen the bubbles. The body was found near the place that he pointed out. The witness testified that it was possible to drive a car within seventy-five feet of the scene of the drowning without any difficulty.

Huttie Joe Parks, the ten-year-old daughter of the appellant and his wife, was called as a witness for the state. In the record her testimony covers twenty pages in question and answer form. She testified in substance that since the death of her mother she had been living with her grandmother and grandfather in Abilene, Texas; that previous to her mother's

death she had gone to school in Sweetwater, Texas; that she was attending school at Abilene at the time of her mother's death; that she was in the high fourth grade at the time she gave her testimony; that on the day previous to her mother's death, the witness, together with her father and mother and younger sister, went fishing at Lake Trammell; that they caught no fish that day; that they went back the next day and parked their car some distance from the place where her parents were fishing; that she and her sister played about the car while her father and mother were fishing. Describing the events upon the day that her mother lost her life, the witness related the fact that after going to the keeper's house for the purpose of obtaining bait, they got four fishing poles (one for each member of the party) and parked the car some distance (shown by other testimony to be about 100 yards) from the place where the tragedy occurred; that the children were directed both by the father and mother to remain in the car, giving as a reason therefor that the heat was too intense for them to fish; that the poles intended for their use were left in the car; that some time after the father and mother had gone fishing, the father returned to the car in which the children were sitting. They were in the back seat of the car and could not see the immediate locality where their father and mother were fishing. On direct examination the witness stated that while she and her sister were sitting in the car, she heard some splashing in the water; that upon hearing it they went down to the water and found their father and mother. She said that her mother was in the water and was trying to get out; that she hollered for help twice. She could see her mother plainly. Her father was standing close to the lake where her mother was. Her father saw her mother in the water but failed to help her out. They then went in the car for help. Her father did not jump in the water and did not go for help except in the car. In going for help they found a man who came back with them. The children went to a house while their father and the man went to the lake. On cross-examination, the child's testimony was not materially different from that on her direct examination, except in the particulars hereinbelow pointed out. There were a great many leading questions asked with reference to whom she had talked and matters of that kind touching the tragedy. She testified that her father and mother were in the habit of going fishing and taking the children with them; that except on the two occasions mentioned, they had not previously been to the lake where her mother was drowned. The reason for leaving

the children in the car was that the sun was shining and it was too hot for them to expose themselves. That was the reason her mother gave for not taking the children fishing. Her father and mother left and went down to the water's edge while the children remained in the car. The children could not see their parents while they were fishing. After the parents had been gone for some time the father approached the car in which the children had been left. When he was near the car, the witness heard a splash and heard some one scream. Previous to that time she had become impatient about fishing and had sent her sister to the lake to see about fishing. When her father returned with her sister and was close to the car, the witness heard the splash. She and her father then went to the water's edge. She saw her mother in the water and heard her screaming. Her father reached down for her three times but could not reach her. He then took the children back to the car and they all went for help. She had heard her father say that he could not swim. He had declined to take her swimming because he said he could not swim.

It was shown without controversy that for a number of months prior to the death of the deceased the appellant had habitually indulged in illicit relations with a woman about twenty-four years of age. As stated in the original opinion, the day after his wife was buried, appellant addressed to the woman mentioned a letter containing endearing language and supporting the thought that appellant intended to continue his relations with her. He had given her money at various times. Appellant had taken out $18,000 worth of insurance on the life of his wife, part of which had been taken out some time prior to the homicide and $13,000 of which had been applied for within a short time prior to the death of his wife. The applications were signed by the appellant. One or more of them were signed in the name of his wife, but there was evidence that the signatures were in the handwriting of the appellant. He had some policies upon his own life, one of which was made with loss payable to his paramour. There was evidence without conflict that prior to the death of his wife the appellant's reputation as a peaceable law-abiding citizen was good. Touching his financial situation reference is made to the original opinion.

The testimony of the witness Huttie Joe Parks as to whether appellant was at the water's edge or at the car at the time the witness heard the splash is conflicting. That is to say, in her direct examination it is made clearly to appear that at the time of the splash and scream her father was at the water's

edge and the witness was at the car; that she went to the water's edge and saw her mother in the water and her father standing on the bank. On cross-examination it is made to appear that at the time she heard the splash her father was in the act of approaching the car and was not at the water's edge. Appellant stated to witness that when they went back to the water's edge, he did not see his wife. The little girl's testimony was that when she reached the water's edge her father was there; that her mother was in the water struggling and calling for help. Her father said he could not swim. The state's witnesses testified that the appellant could swim. The conflict of evidence was a matter for the settlement by the jury. See Tex. Jur., vol. 18, p. 420, sec. 299, and cases cited. In the instant case, the verdict implies that the testimony of the witness Huttie Jo Parks, which was favorable to the state, was accepted as true by the jury. Such being the case, it is not within the province of the appellate court to set aside the verdict because of any conflict in her testimony. The court's duty is to determine whether there were facts in evidence sufficient to support the verdict, assuming that the conflicts in the evidence were settled by the jury. See article 847, C. C. P., 1925; also Mason v. State, 108 Texas Crim. Rep., 452; Claxton v. State, 105 Texas Crim. Rep., 308; Green v. State, 97 Texas Crim. Rep., 52; Taylor v. State, 87 Texas Crim. Rep., 330; Foster v. State, 111 Texas Crim. Rep., 278; Williams v. State, 109 Texas Crim. Rep., 116; Bennett v. State, 78 Texas Crim. Rep., 231. The conflicting evidence having been settled by the jury, their verdict is binding upon the court.

On the question of the proof of the corpus delicti the following remarks are made: That the deceased was drowned is established by the circumstances and by the testimony of the physician who examined the body. From the testimony of Huttie Jo Parks, it was shown that the appellant was present at the time that the deceased entered the water. This appears from her testimony on direct examination in which she said that while her father and mother were fishing she heard a splashing in the water; that upon rushing to the scene she found both her father and mother; that her father was standing on the bank of the lake and her mother was in the water trying to get out; that her mother called for help three times. It is thought that the jury was justified in eliminating the theory of suicide. The testimony of the little girl that her mother was calling for help and trying to get out of the water is of weight on the subject of suicide. In fact, no reason for suicide appears in the record.

The crucial question is whether the death of the deceased was due to accident or to the criminal agency of the appellant. On the subject of accident or criminal agency, we find in support of the jury's verdict a great deal of testimony, including a number of photographs describing the topography of the ground and the condition of the lake at the place where the tragedy occurred. From the little girl's testimony it appears that at the time she saw her mother in the water there was no one present save her father. He claimed at the time that he could not swim, and at the same time told the little girl to go back to the car. There was evidence from which the jury was justified in concluding that the appellant's statement that he could not swim was not true. The appellant's statement after the tragedy that he did not hear his wife in the water is in conflict with the testimony of his daughter, above quoted. It is in substance in conflict with the testimony of the witness Reid, quoted above. The conduct of the appellant on the previous day in driving about the lake thus familiarizing himself with the various localities and on the subsequent day in selecting a place which apparently was somewhat isolated, his act in leaving the children at a distance of more than one hundred yards from the place where the tragedy occurred, the evidence showing that in going for help he passed by the nearest individuals who were available and went on a rough road to a more distant locality to secure the aid of the witnesses Wright and Reid, are available to the jury in deciding the case.

Testimony descriptive of the locality in which the deceased lost her life, the topography of the ground, the depth of the water, and all surroundings came not only from the oral testimony to which reference has been made in the original opinion, but from photographic exhibits, eleven in number, which were introduced before the jury. Their accuracy was vouched for by the photographer, and they illustrated various positions of person in the water at the time. With reference to these exhibits there was given testimony by persons familiar with the scene of the tragedy, which testimony was available to the jury in forming their conclusion with reference to whether the tragedy was due to accident or some criminal agency. The photographs make evident the fact that at the place where it is claimed that the deceased was fishing there was a ledge of rock covered by a few inches of water which extended out into the lake for a considerable distance before reaching the point where the water was deep. From this testimony, together with the exhibits attached, the jury was able to obtain a more accurate knowledge

of the conditions at the time of the tragedy than can be portrayed by the mere words found in the written record. The verdict of the jury implies that the theory of the state, as shown by the photographs, as explained by the witnesses who testified upon the trial, was accepted by the jury, being legitimately before the jury and susceptible of the construction for which the state contends, namely, that the physical facts exclude the probability of accident.

We deem the evidence to which we have adverted such as justified the jury in concluding that the death of the deceased was not due to accident or suicide, but to the act of the appellant. The only person present at the time the deceased entered the water being the appellant, the evidence bearing upon his motive is regarded as available to give emphasis to his acts and declarations, conflicting in themselves and conflicting with other testimony, upon the issue of the corpus delicti. The foregoing conclusion, it is thought, is in consonance with the many precedents cited and declarations made in Wharton on Homicide (3rd. Ed.), p. 913, sec. 595, from which we quote as follows: "When the corpus delicti has been proved in a prosecution for homicide, and the circumstances indicate that the accused was the perpetrator of the homicide, facts tending, even though remotely, to show a motive are admissible in evidence against him, though the jury should exercise great caution in attaching importance to such proof. And all evidence of whatsoever nature tending to throw light upon the relations existing between the accused and the deceased, and the feeling existing between them, is competent."

Deeming the evidence before the jury sufficient to support the verdict of conviction, the members of this court are constrained to overrule the motion for rehearing, which is accordingly ordered.

*Overruled.*