**Charles Dennis EASLEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 56321.**

Court of Criminal Appeals of Texas, Panel No. 1.

April 12, 1978.

Rehearing En Banc Denied May 3, 1978.

Gene Douglass, Wichita Falls, for appellant.

Melvyn Carson Bruder, Sp. Prosecutor, Dallas, for the State.

Before TOM G. DAVIS, DALLY and W. C. DAVIS, JJ.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for the offense of murder under the former penal code. The appellant was indicted in · Grayson County, but there was a change of venue to Collin County. A jury returned a death penalty verdict, the trial judge granted a new trial, and there was another change of venue to Victoria County. After a jury was impaneled in Victoria County the appellant's jury waiver was accepted and approved; the court heard the evidence, entered a judgment of guilty, and sentenced the appellant to life imprisonment.

The appellant asserts that he was denied his constitutional rights to a speedy trial and against unreasonable searches and seizures. He also asserts that the evidence is insufficient to sustain the judgment.

The determination of whether appellant was denied a speedy trial is complicated because of the two changes of venue and the new trial which he was granted. Furthermore, during the same time period the appellant was tried twice for another murder; there were two jury trials and a

change of venue; these trials resulted in the assessment of substantial punishment, but both judgments were reversed on appeal. See *Easley v. State,* 493 S.W.2d 199 (Tex.Cr.App.1973); and *Easley v. State,* 529 S.W.2d 522 (Tex.Cr.App.1975).

The right to a speedy trial is guaranteed by the Sixth Amendment to the Constitution of the United States as applied through the Fourteenth Amendment. *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969); *Dickey v. Florida,* 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970); *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The same right is assured by Art. I, Sec. 10 of the Texas Constitution, and Art. 1.05, V.A.C.C.P.

■ Whether an accused has been denied a speedy trial may be determined by a "balancing test" which was set out in *Barker v. Wingo,* supra. Each case requires consideration of the following factors, although they are not exclusive:

(1) the length of the delay;
(2) the reason for the delay;
(3) the defendant's assertion of the right; and
(4) the prejudice to the defendant resulting from the delay.

See also *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973); *Turner v. State,* 545 S.W.2d 133 (Tex.Cr.App.1976); *Wilkerson v. State,* 510 S.W.2d 589 (Tex.Cr. App.1974); *McKinney v. State,* 491 S.W.2d 404 (Tex.Cr.App.1973).

■ There is no precise length of delay which irrefutably constitutes a violation of the right to a speedy trial in all cases. The length of the delay is measured from the time the defendant is formally accused or arrested. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975). Five years elapsed from the time of the appellant's arrest until the time of his trial; that is certainly sufficient to require the application of the balancing test of *Barker v. Win-*

*go,* supra, and that time must be considered in determining appellant's speedy trial claim.

We next consider the reasons for the delay; we are told that different weight should be assigned to different reasons. For example:

"A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government [footnote omitted]. A more neutral reason such as negligence or overcrowded court should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." *Barker v. Wingo,* supra, 92 S.Ct. at 2192.

Donna Golish disappeared on September 10, and her body was found on September 11, 1969. The appellant was arrested on April 8, 1970. On April 16, 1970, he was indicted for the murder of Donna Golish, and on the same day also was indicted for the murder of Laurie Stevens, who had been killed on April 1, 1970. On May 25, 1970, appellant was granted a change of venue to Wichita County in the Stevens case; trial commenced on July 6, 1970, and the appellant was convicted. On September 2, 1970, appellant was granted a change of venue to Collin County in the Golish case; trial commenced in March, 1971, and the appellant was convicted.

Appellant's conviction for the murder of Laurie Stevens was reversed on March 14, 1973. On September 12, 1973, appellant was granted a new trial in the Golish case. On March 18, 1974, the second trial of appellant for the murder of Laurie Stevens commenced in Wichita County, and appellant again was convicted. On April 8, 1975, appellant was granted a change of venue to Victoria County for his second trial for the murder of Donna Golish; trial commenced on April 21, 1975, and appellant again was convicted. This appeal is from that conviction.

On July 6, 1970, appellant filed a motion for a continuance in the first trial of the Stevens case, and the motion was overruled. On December 31, 1970, appellant filed a motion for a continuance in the first trial of the Golish case; the record does not reflect that the motion was ruled on by the court. On September 17, 1973, appellant filed a motion for a continuance in the second trial of the Stevens case, and the motion was granted.

■ It is apparent that the delay of which appellant complains was occasioned in substantial part by his two trials for the murder of Laurie Stevens and the pendency of his appeals from those convictions. That the appellant was being prosecuted on other charges constitutes a valid reason for the delay in bringing him to trial. See *Black v. State,* 505 S.W.2d 821 (Tex.Cr.App.1974); *Turner v. Estelle,* 515 F.2d 853 (5th Cir. 1975); *United States v. Kress,* 451 F.2d 576 (9th Cir. 1971); *United States v. Holt,* 145 U.S.App.D.C. 185, 448 F.2d 1108 (1971).

■ Appellant was charged with the separate murders of two young girls. Both cases were based on circumstantial evidence. Detailed scientific analysis of the evidence, including ballistics tests and neutron activation analysis, was required; some of the evidence was sent to Washington, D. C. for examination. Both the seriousness and the complexity of the charges are to be considered in evaluating a defendant's speedy trial claim. *Barker v. Wingo,* 92 S.Ct. at 2192; see *United States v. Bloom,* 538 F.2d 704 (5th Cir. 1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 814, 50 L.Ed.2d 792 (1977); *United States v. Baumgarten,* 517 F.2d 1020 (8th Cir. 1975), cert. denied, 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1976).

■ The appellant first asserted his right to a speedy trial on July 21, 1976, more than a year after he was brought to trial. This is not a timely assertion of the right. See *Thomas v. State,* 530 S.W.2d 834 (Tex.Cr.App.1975); *Archie v. State,* 511 S.W.2d 942 (Tex.Cr.App.1974); *McCarty v. State,* 498 S.W.2d 212 (Tex.Cr.App.1973);

*Haas v. State,* 498 S.W.2d 206 (Tex.Cr.App. 1973). The right to a speedy trial applies to neither delays in sentencing, *Ramos v. State,* 486 S.W.2d 297 (Tex.Cr.App.1972), nor the appellate process. *Colunga v. State,* 527 S.W.2d 285 (Tex.Cr.App.1975); *Zanders v. State,* 515 S.W.2d 907 (Tex.Cr. App.1974).

■ It is generally said that there are three interests to be considered in determining prejudice to the defendant, which are as follow: (1) prevention of oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. *Barker v. Wingo,* supra; *United States v. Ewell,* 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); *Smith v. Hooey,* supra; *Klopfer v. North Carolina,* supra; *Turner v. State,* supra; *McKinney v. State,* supra.

While it is true that appellant has been incarcerated for nearly eight years, his incarceration has been due to the prolonged nature of his four trials and three appeals, as well as the delay of which he now complains. Accordingly, whatever anxiety or concern he has experienced is not solely attributable to the delay in this case.

Appellant complains stringently that the memories of several witnesses for the State had dimmed greatly as a result of the time intervening between the date of the offense, the time of the first trial, and the time of the second trial. Appellant contends that "the most graphic example" of prejudice that he suffered due to a witness' poor memory was the testimony of Texas Ranger Stuart Dowell, who testified concerning probable cause for the appellant's arrest. Since the lawfulness of that arrest is not a material issue in the disposition of this appeal, we cannot say that appellant was prejudiced by Dowell's loss of memory. See *United States v. Avalos,* 541 F.2d 1100 (5th Cir. 1976); *United States v. Shepherd,* 511 F.2d 119 (5th Cir. 1975). Appellant also argues that the memories of Blain England and Barry Keller, who testified that they saw appellant in the area where Donna Golish disappeared, were not so clear in

regard to significant details as they had been at the former trial. The record, which contains their testimony from the first trial as well as their testimony at the recent trial, actually reflects that their later testimony was more detailed and less equivocal. Both witnesses were in the first grade at the time they observed the events, in the second grade at the time of the first trial, and in the sixth grade at the time of the second trial. It is not unreasonable to assume that they were able to testify more positively because they were more mature and were better able to express themselves. In any event, appellant had access to their previous testimony and used it in an attempt to discredit their testimony at the second trial. Under the circumstances of this case, any prejudice suffered by appellant due to witnesses' dimmed memories was minimal. See *Wilkerson v. State,* supra; *Tatum v. State,* 505 S.W.2d 548 (Tex. Cr.App.1974); *McCarty v. State,* supra.

The appellant urges that the search of his Pontiac car was unreasonable, unlawful, and in violation of his constitutional rights, and that paint scraped from the oil pan of the car should not have been admitted in evidence. When the appellant was arrested on April 8, 1970, for the offense of theft, the arresting officers took possession of the Pontiac car which he was driving prior to his arrest. Paint subsequently was scraped from the oil pan of the car and was admitted in evidence.

The State has advanced several theories on which the search that resulted in paint being scraped from the oil pan of the appellant's car may be upheld. The only theory which is tenable is that based upon the holding of *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). In that case, officers, with probable cause and without a search warrant, took paint scrapings from the fender of the accused's impounded car; they also made comparisons between the tread on the car's tires and the cast of a tire impression made at the scene of the crime. The Court observed that "insofar as Fourth Amendment protection extends to a motor vehicle, it is the right to privacy that is the touchstone of our in-

quiry." 94 S.Ct. at 2470. After noting that nothing from the interior of the car had been searched or seized and introduced in evidence, the Court continued as follows:

"With the 'search' limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed.

\* \* \* \* \* \*

"Under circumstances such as these, where probable cause exists, a warrantless examination of the exterior of a car is not unreasonable under the Fourth and Fourteenth Amendments." 94 S.Ct. at 2470.

When the appellant was arrested, law enforcement officers knew that an automobile had likely been an instrument used in committing the murder of Donna Golish. She had been killed in a manner consistent with having been hit and dragged by an automobile, and a particle of paint had been found on her body. A man fitting the description of appellant, in an automobile matching the Pontiac's appearance, was seen near where Donna Golish was last seen alive on the day she disappeared. The appellant was seen later on that same day diligently washing underneath the Pontiac. We hold that there was probable cause for obtaining the paint chip from the oil pan of the Pontiac car, and that the search and seizure of the paint chip from the exterior of the car in these circumstances was not unreasonable and was not a violation of appellant's constitutional rights. *Cardwell v. Lewis,* supra; *Vasquez v. State,* 532 S.W.2d 338 (Tex.Cr.App.1976).

The appellant urges that the evidence is insufficient to prove the corpus delicti because it does not show that Donna Golish's death was caused by criminal means. He also urges that if the corpus delicti was proved, there is insufficient evidence to show that he is the person guilty of the offense.

In *Self v. State,* 513 S.W.2d 832 (Tex.Cr. App.1974), the two elements of corpus de-

licti in a murder case were said to be (1) the body of the deceased must be found and identified; and (2) the death of the deceased must be shown to have been caused by the criminal act of another. The third element which must be shown to sustain a murder conviction, but which is not properly a part of the corpus delicti, is that the accused must be shown to have been the guilty agent connected with the criminal act. The new penal code, which has omitted the requirement that the body be found before a prosecution for murder may be maintained and which contains other changes, may somewhat alter the first element of corpus delicti as set out in *Self v. State,* supra, but we need not consider that in this case, as the body of Donna Golish was found and identified. It is the other element of corpus delicti, that is that Donna Golish's death was shown to have been caused by the criminal act of another, that requires a more careful analysis of the evidence.

Donna Golish's body was found in a field near Gallagher Road and Oil Field Road. Roscoe Vernon Clinton, Jr., a member of the search team, discovered the body in "some real high grass" approximately eighteen feet from Oil Field Road. The body was clad in only a slip, which was pushed up underneath the deceased's arms.

Billy W. Lambert, an officer in the Sherman Police Department, also participated in the search for Donna Golish. He found the deceased's socks "hung on some bushes on the south side of Gallagher Road," and her shoes in a grassy area twenty-five or thirty feet from Gallagher Road.

An autopsy by Dr. Charles Petty, chief medical examiner of Dallas County and director of the Criminal Investigation Laboratory of Dallas County, revealed the following injuries: tear of the left ear; pair of abrasions or rub marks on the majority of the face; fracture of the left tibia and fibula; deep lacerations extending the length of the front of the left thigh; series of rubbings of the skin on the extremities and trunk; fracture of the right side of the skull; fracture of the eighth rib on the right; fracture of the right femur and long bone on the right thigh; extensive tearing of the right lobe of the liver; torn fingernail on the right ring finger; minor hemorrhage in the back wall of the vagina; bruising of the heart; and fracture of the jaw on the right.

Petty testified that the pattern of injuries—including the amount of rubbing of the skin, the abrasions of both cheeks and the extremities, the pulling away of the skin and underlying tissue on the back of the right elbow, and the fracture of the lower leg bones—was similar to that seen in individuals who are struck or drug by an automobile or thrown from or have fallen from a moving vehicle. He also testified that the fracture of the skull and the hemorrhage inside the opening of the vagina were not compatible with an automobile accident, that the fracture of the skull and the underlying bruising of the brain were compatible with the deceased having been struck with something while the head was still and that the hemorrhage was compatible with the deceased's vagina having been penetrated by the erect penis of an adult male. He also testified that the broken jaw was compatible with the deceased having been struck by the fist of an adult male.

Petty further testified that while it was possible that the deceased was thrown from or dragged by an automobile, it was unlikely that she was struck by an automobile, because "individuals who are upright and are struck by an automobile usually have a demonstrable point of impact where there is a significant injury," and that the body of the deceased revealed no such point of impact. Petty also stated that, other than the injuries described, "the child was quite healthy and showed no evidence of any disease process."

In summary, the evidence shows quite strongly that the death of Donna Golish was caused by criminal means. She was healthy and had attended school on the morning of the day that she disappeared, indicating that she did not die of natural causes. Her body was found clad in only a slip in high grass eighteen feet from the

nearest road. Her shoes and socks were found some distance from the body, the socks hanging on a bush, and no other clothing was found. There was no demonstrable point of impact on the body to indicate that she was struck by an automobile, and the fracture of her skull and the hemorrhage inside her vagina were not compatible with an automobile accident. Thus, the evidence indicates that her death was not accidental. Dr. Petty testified that the fracture of the skull and bruising of the brain were compatible with the deceased having been struck with something while the head was still, that the hemorrhage inside her vagina was compatible with it having been penetrated by the erect penis of an adult male, and that her broken jaw was compatible with the deceased having been struck with the fist of an adult male. His testimony indicates that her injuries were intentionally inflicted.

We hold that the circumstantial evidence presented by the State was sufficient to establish the corpus delicti in this case. See *Simpson v. State,* 163 Tex.Cr.R. 385, 291 S.W.2d 341 (1956); *Gragg v. State,* 152 Tex.Cr.R. 386, 214 S.W.2d 292 (1948); *Parks v. State,* 124 Tex.Cr.R. 405, 63 S.W.2d 301 (1933).

We will now consider the sufficiency of the evidence to prove that the appellant was the person who inflicted the injuries which caused the death of Donna Golish; some repetition in the summary of the evidence is necessary.

The deceased, Donna Golish, was a seven-year-old first-grade student. She was last seen alive at about 12:00 noon on September 10, 1969, after she was dismissed from school. It was Donna's habit to walk home from school through a public park. On September 10, when Donna did not reach home within twenty minutes after she was dismissed from school, as she usually did, her parents began to search for her and notified the police that she was missing. The next day an extensive search commenced in which citizens joined law enforcement officers; the deceased's body was found at approximately 11:00 a. m.

The body was discovered near Gallagher Road and Oil Field Road on the outskirts of the city by a citizen who was searching on horseback. The body, clad in only a slip, was in tall grass. The first law enforcement officer on the scene observed, removed, and preserved what appeared to be "a small piece of paint imbedded in the left heel in some oil that was on the heel."

At noon on September 10, Craig Watson, a fourth-grade student, saw Donna Golish after she left the school grounds and was walking through the park following first-grade students Blain England and Barry Keller. Blain England testified that after he left the school grounds on September 10 he walked through the park with Barry Keller. In a low-lying area in the park, Blain saw a fairly old cream-colored car with a flag decal on a rear side window and an Astro baseball team decal on a vent window. Blain saw a young man with black hair sitting by himself in the car. The man, who was smoking a cigarette, was sitting sideways on the right front seat with his feet on the ground. The man spoke to the boys and said, "hello" or "hi," and Blain replied "hi." Blain testified that the appellant looked exactly like the man he saw in the car in the park except that the man's sideburns were longer. Blain did not remember seeing Donna Golish walking home on September 10.

Barry Keller testified that after he left the school grounds on September 10 he saw Donna Golish walking behind him through the park. He also saw the cream-colored car in the park and saw in the car a heavy, college-aged man with black hair and sideburns. At the trial he testified that the appellant was the man he had seen in the car in the park on September 10.

Appellant lived with his parents and younger brother. The family had two cars, and the one that appellant usually drove was a beige, 1963 Pontiac Tempest. Adeline Green, the Easleys' next-door neighbor, testified that the two cars usually were parked in the Easley front yard, and that on September 10, 1969, the appellant's Pontiac was not parked there between noon

and 1:00 p. m. She also testified that on the afternoon of September 10, 1969, she saw appellant in his back yard washing his car using a high-pressure nozzle and that he was washing underneath the car very diligently. Mrs. Green testified that appellant washed his car "every day or more than once a day even," but that he usually washed it in the front yard.

Grayson County Sheriff G. W. Blanton identified photographs of appellant's car. He testified that a decal on one window was of an American flag and that something that "looks like a decal" was on one of the vent windows. One photograph also showed an indentation on the front bumper.

On April 8, 1970, the appellant was arrested, and law enforcement officers obtained possession of a Pontiac Tempest, the title of which was in the appellant's name, and a 1968 red Chevrolet, the title of which was in the name of appellant's brother, Jimmy. The officers obtained from the oil pan of the Pontiac paint chips and from the glove compartment of the Chevrolet a City of Sherman map. On the map, circled and labeled in handwriting, was an area near the elementary school which Donna Golish had attended, and there was a line drawn from that area to Gallagher Road, where the body of Donna Golish was found. Gallagher Road was not printed on the map but it had been drawn on the map with a pen. There is no evidence to show who made these marks on the map or when they were made.

Charles Michael Hoffman, a chemist and chief of the Forensic Laboratory of the United States Treasury Department, testified that by microscopic inspection, a chemical solvent test, and neutron activation analysis he had compared the paint particles removed from the heel of the deceased's body with paint particles taken from the oil pan of the appellant's car. Hoffman explained the neutron activation analysis technique and testified that in his opinion the paint particles came from the same batch of paint, because he found the elements of manganese, copper, samarium, sodium, chromium, cobalt, and antimony in the same concentration in both particles of paint. In his prior experience, Hoffman said he had never found two batches of paint that had the same trace elements in the same concentration even when he had analyzed batches of paint made by the same manufacturer using the same formula and the same source of raw materials.

Witness Emel F. Benson was an employee of the Grow Chemical Company, Pontiac Coatings Division, Pontiac, Michigan. He was the technical director of the coatings division and his main duties were to direct chemists and technicians in paint development and to maintain quality control of the paint used by the Pontiac Division of General Motors. He testified that eighty-two batches of from 500 to 600 gallons each of Bedford Blue paint were made for use on the oil pans and valve covers of Pontiac automobiles for 1963 and 1964. One batch of paint would be consumed in painting between 5,000 and 7,200 automobiles. Bedford Blue paint ingredients included manganese, copper, chromium, and cobalt. Sodium and samarium would be impurities if found in Bedford Blue paint. Benson thought it highly unlikely that the Bedford Blue paint his company made for Pontiac automobiles was used on other General Motors cars.

A conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the accused, and proof amounting to only a strong suspicion or mere probability is insufficient. Stogsdill v. State, 552 S.W.2d 481 (Tex.Cr.App.1977); Flores v. State, 551 S.W.2d 364 (Tex.Cr.App.1977); Easley v. State, 529 S.W.2d 522 (Tex.Cr. App.1975); Indo v. State, 502 S.W.2d 166 (Tex.Cr.App.1973). It is not necessary, however, that every fact point directly and independently to the guilt of the accused, and the cumulative force of all the incriminating circumstances may be sufficient to warrant a conclusion of guilt. Stogsdill v. State, supra; Flores v. State, supra.

Appellant was not seen in the company of the deceased nor near where the body of

the deceased was found. The evidence which the State contends is sufficient to exclude every reasonable hypothesis but the guilt of appellant may be summarized as follows:

(1) The appellant's automobile and the appellant were seen in the area where the deceased was last seen alive close to the time of the deceased's disappearance, and the appellant was speaking in a friendly manner to children who did not know him.

(2) Some of the injuries suffered by the deceased were compatible with her having been struck or dragged by a car, and the paint chip found on the deceased's body was chemically similar in all respects to the paint chip taken from the oil pan of appellant's car. However, the probative force of this evidence is diminished somewhat by the fact that as many as 7,200 cars may have had oil pans painted with similar paint, and by the lack of evidence to prove that the oil pan from which the paint sample was taken was on appellant's car at the time the deceased was killed.

(3) Appellant was seen washing the underneath part of his car within hours after the deceased was last seen alive; however, it was not clearly established that the deceased was killed at a time previous to the time the appellant was seen washing his car.

(4) Appellant's car was not parked in its usual place between noon and 1:00 p. m. on the day the deceased disappeared.

(5) The map found in the appellant's brother's car showed markings indicating both the area where the deceased was last seen alive and where her body was found.

■ We find the cumulative force of all the incriminating circumstances sufficient for the trial judge, as the finder of the facts in this case, to conclude as he did that the appellant was guilty beyond a reasonable doubt of the offense with which he was charged.

The judgment is affirmed.