Juan Ramon ORTIZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–83–0570–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Sept. 20, 1984.

Ken J. McLean, Houston, Charles C. Cate, Katy, for appellant.

William A. Meitzen, Fort Bend County Dist. Atty., Donald W. Bankston, Fort Bend County Asst. Dist. Atty., Richmond, for appellee.

Before EVANS, C.J., and WARREN and BULLOCK, JJ.

## OPINION

BULLOCK, Justice.

Appellant was originally indicted and tried in Fort Bend County for murder. However, the trial court declared a mistrial when the jury could not reach a verdict on guilt or innocence. The cause was then transferred by change of venue to Comal County, where a jury found appellant guilty of murder and assessed punishment at fifteen years confinement.

We affirm.

On July 16, 1982, game wardens discovered four badly decomposed bodies along the Brazos River in Fort Bend County. Further investigation disclosed that the vic-

tims had been Salvadoran nationals, illegal aliens who had been murdered between July 2–4, 1982. Other Salvadorans, who had entered the United States with the victims, identified the corpses through the clothing, the decomposition having made recognition of the victims' features impossible. The victims had been bound with rope. The coroner testified that the four had died from gunshots, at close range, to the head. Authorities also recovered seven spent nine millimeter (9mm) cartridges and one spent 9mm bullet at the murder site.

Investigation by law enforcement authorities ultimately led to a gang of Hispanics known as "Los Tejas" or "Mafia de los Tejas," and to several units of an apartment complex in southeast Houston that the gang rented and occupied. The police obtained the property owner's permission to search those units and discovered human hair and human blood in one of the units.

A grand jury indicted thirteen members of this gang, including appellant, known as Juan or Juanio Ortiz.

Police officers testified that their investigation revealed that the gang rented several units of the apartment complex; that they frequently occupied these units; that a major occupation of the gang was to be "coyotes," individuals who agree to import illegal aliens into the United States for money; that neighbors had seen the gang on many occasions bringing illegals into or moving illegals out of the apartments; that appellant was a member of the gang; and that appellant was usually armed with a 9mm handgun.

Four individuals who had come to the United States from Central America through the gang's activities as "coyotes" testified at appellant's trial. All of these individuals testified through a translator.

Cruz Ventura testified that in June, 1982, he left El Salvador for the United States in the company of seven countrymen, including the four victims. In Monterrey, Mexico, Ventura testified, the group met one Pedro Hernandez, who offered to turn the group over to "coyotes" who would transport them to Houston for $500 per person.

The group crossed the Rio Grande at Nuevo Laredo by raft (for which, Ventura testified, the "coyotes" made them pay extra), whereupon most of them were herded into the trunk of an automobile, the remainder riding inside the vehicle, and taken to Houston. During this eight-hour journey the "coyotes" provided neither food nor water to their helpless charges. Upon arriving in Houston, the "coyotes"—now armed with automatic handguns—herded the refugees into an apartment that Ventura identified at trial through photographs as one of the apartments occupied by the gang, ridiculed and harrassed them, and informed them that the "selling price" was now $800 per person. Appellant and another gang member took Ventura and another Salvadoran, Roman Turcios, to a restaurant to inform the illegals' families of the higher price for delivery. The negotiations were unsuccessful, and the foursome returned to the apartments. There, Ventura testified, the gang members were outraged over a gun battle that had occurred while Ventura's group was at the restaurant, in which another Salvadoran had escaped after his relatives had shot and killed a gang member. At this point appellant and other gang members beat and kicked the remaining Salvadoran illegals, bound them with rope, cut their hair, stuffed it in their mouths, and poured a noxious liquid down their noses in an attempt to drown them. The gang members then put the bound and helpless Salvadoran victims in a room and told them they would cut their heads off in the morning. During the night, Ventura and another Salvadoran, Victor Turcios, freed themselves and their companions from their bondage and attempted to escape. Ventura and Victor Turcios were successful; Ventura testified that the other four failed in their escape attempt, and that he never saw them alive again.

Mario Ventura, another member of the illegal group, testified at trial, corroborating Cruz Ventura's testimony as to the group's arrival in Houston in early July, and their treatment when they arrived at the apartment. He testified that a gang member took him to a grocery store to

inform his relatives of the "price increase," and that a gun battle ensued, in which a gang member died, and he made his escape.

Victor Turcios also testified at appellant's trial, corroborating Cruz Ventura's story in every respect.

Gerardo Perez, a Mexican national imported illegally by the gang approximately twenty-four hours after the Salvadoran group, also testified at appellant's trial. Perez described the barbarous treatment meted out to him by the gang members, including appellant, this treatment being only slightly less appalling than that testified to by the survivors of the first group. The gang then locked him and his wife in the same apartment that the Salvadoran witnesses had identified with four badly beaten Salvadorans, whom Perez described as securely tied with rope. Some time later, Perez testified, appellant and another gang member entered this apartment and took the four Salvadorans out, laughingly claiming that their families had paid for them. Perez, a highly educated man familiar with hunting and firearms, testified that appellant carried a 9mm automatic, while his companion carried a .38 caliber handgun. The two gang members returned later, Perez testified, without their Salvadoran prisoners.

Jose Mejia, the maintenance worker at the apartment complex, testified that "Los Tejas" or "Mafia de los Tejas" was an Hispanic group that rented the apartment units in question and that he had observed them in their trade as "coyotes," while illegals were present. He specifically identified appellant as a gang member and as a "coyote," described from personal observation the 9mm weapon appellant carried, and testified that appellant had once told him that if he ever wanted someone killed, the gang would take care of it for him.

Appellant's counsel cross-examined each of these witnesses vigorously, including law enforcement personnel, counsel later contending that the law officers' informants had implicated another individual instead of appellant. Nothing in the record, however, demonstrates that, apart from se-mantic difficulties encountered when cross-examination requires an interpreter, counsel elicited any contradiction of this evidence. Appellant's case rested on alibi; his wife testified at trial that on one of the days the killings may have occurred, she saw him "leave for work."

The trial court properly charged the jury as to the law of parties, *infra*, and the jury convicted appellant of the murder of Roman Turcios.

Appellant presents five grounds of error, comprising two related arguments:

1) That insufficient evidence exists in the record to support appellant's conviction for murder (Ground of Error 1) and

2) That the trial court improperly applied the law of parties to the case, because insufficient evidence exists to establish that appellant acted either alone or in concert with his fellow "coyotes" (Grounds of Error 2–5).

Appellant argues that the evidence in this case is totally insufficient to support his conviction on the charge of murder. There is, in appellant's view, no evidence that ties appellant to the murder of the victims. We disagree.

The Texas Court of Criminal Appeals has clearly established the standard of review for judging the sufficiency of the evidence supporting a conviction based on circumstantial evidence:

> [C]ircumstantial evidence will be sufficient to support a conviction if the facts proved support a reasonable inference that the defendant committed the crime and exclude to a moral certainty any inference consistent with his innocence.

*Wilson v. State,* 654 S.W.2d 465, 467 (Tex. Crim.App.1983); see also *Easley v. State,* 564 S.W.2d 742, 749 (Tex.Crim.App.1978). This standard of proof does not require the presence of one concise, discrete fact establishing of its own force the guilt of the accused:

> It is not necessary ... that every fact point directly and independently to the guilt of the accused, and the cumulative force of all the incriminating circum-

stances may be sufficient to warrant a conclusion of guilt.

*Easley v. State,* 564 S.W.2d at 749.

The "reasonable hypothesis" test has not changed the fundamental interest we have in reviewing the sufficiency of the evidence to support a conviction:

[C]ircumstantial evidence should not be tested by an *ultimate* "standard for review" different from direct evidence; the standard in both kinds of cases is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt [Emphasis in the original].

*Carlsen v. State,* 654 S.W.2d 444, 449 (Tex. Crim.App.1983); *Griffin v. State,* 614 S.W.2d 155, 159 (Tex.Crim.App.1981).

█ The State introduced all of the evidence described, *supra,* without objection or any contradiction by appellant. The only hypothesis appellant raised during trial was that he had not even been present during the period of time he allegedly abused and ultimately murdered the Salvadorans, but this hypothesis fails in light of the uncontradicted testimony of four of the very people upon whose numbers the gang members preyed. They placed appellant, by their testimony and their in-court identification of him, at the apartments where the two groups of illegals debarked. Thus, more than adequate evidence exists to refute appellant's claim of an alibi, and establish his guilt.

The only other reasonable hypotheses remaining are that, while appellant was a member of the gang, either he was not involved in the importation of this group of Salvadorans, or that he was not present and involved during the murders.

The first of these hypotheses fails for the same reasons that appellant's attempt to construct an alibi failed. Witnesses, both within and without the apartment, placed appellant at the apartment and established that he had a direct involvement, not only in the "coyote" business generally, but in this particular scenario itself. We hold that the evidence established that appellant had a continuing involvement in the importation of illegals by this gang.

The second possible hypothesis must likewise fail when we consider the sum of the evidence. This evidence establishes that the gang had a direct involvement as "coyotes"; that appellant was a member of this gang, directly involved in its activities; that appellant habitually carried a 9mm handgun; that the gang imported both the group of Salvadoran illegals from which the victims came and the group of illegals that included Mr. Perez; that appellant physically and verbally abused the Salvadoran illegals; that after one of their members died in the escape of Mario Ventura, the gang decided to kill their desperate charges, and threatened that they would kill them; that appellant was among those who made the threats; that appellant was among those who continued the physical abuse, including an attempt to drown the Salvadorans; that appellant and another gang member removed the remaining Salvadorans from the apartment; that appellant was carrying a 9mm handgun at this time; that the Salvadorans were not released but instead killed by gunshots; that there was spent 9mm ammunition found near the bodies; and that no one saw the victims alive again after appellant and his companion led them away from the apartment.

While the advanced state of decomposition made it impossible to prove on the basis of the coroner's examination, that the death wounds came from a 9mm handgun, the presence of only 9mm ammunition refutes a conclusion that the wounds came from a .38 handgun. Moreover, it is immaterial which gang member actually did the shooting or with which weapon since the trial court properly charged the jury as to the law of parties. *Romo v. State,* 568 S.W.2d 298 (Tex.Crim.App.1978). The evidence clearly and overwhelmingly demonstrates appellant's predisposition to harm, and ultimately to kill, the Salvadorans, and we overrule appellant's first ground of error.

In his remaining four grounds of error, appellant argues that the trial court improperly failed to charge the jury as to the law of parties, because testimony by a law enforcement authority indicated that an informant may have notified them that appellant was not present during the murders. He contends that because a different legal theory between the indictment and proof was thus created, fundamental error exists, and his failure to object to this misapplication of the law of parties is immaterial.

 Tex.Penal Code Ann. sec. 7.01(c) (Vernon 1981) provides:

All traditional distinctions between accomplices and principals are abolished by this section, and *each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice* [Emphasis supplied].

The Penal Code does not require an indictment to contain any reference to the law of parties, and its absence from an indictment is not a fundamental defect, nor does it create a difference in legal theories with the jury charge. *Pitts v. State,* 569 S.W.2d 898, 900 (Tex.Crim.App.1978); *Romo v. State,* 568 S.W.2d at 302–303 (Tex.Crim. App.1978). It is sufficient to satisfy the Code if the charge to the jury contains the law of parties. *Id.* Moreover, we note that the charge properly incorporated the law of parties, including a requirement that the jury acquit appellant if it found that the four individuals alluded to in the alleged informant's story committed the murder without appellant's presence or involvement. Appellant thus received in the charge to the jury precisely what he claims now on appeal that he needed for a fair determination of his case. Appellant's authorities are clearly distinguishable from the instant case. In *Wilson v. State,* 625 S.W.2d 331 (Tex.Crim.App.1981), the indictment failed to allege a culpable mental state. In *Moore v. State,* 574 S.W.2d 553 (Tex.Crim.App.1978), the charge to the jury included alternative grounds for a conviction not alleged in the indictment, and in *Smith v. State,* 574 S.W.2d 551 (Tex.Crim. App.1978), the charge authorized the jury to convict on an offense not alleged in the indictment. In the case at bar, appellant was indicted, tried, and convicted for the offense of murder. While the indictment did not incorporate the law of parties, we hold that it was not necessary under the Penal Code for it to include that law. Thus, appellant having failed to object to the charge, he has waived any objection on appeal. *Pitts v. State, supra; Romo v. State, supra.* Officer Saldivar's testimony intimated indirectly that an unidentified informant had, as appellant points out, suggested that appellant was not physically present at the time of the murders. This in itself is insufficient to create a reasonable hypothesis that the evidence taken as a whole does not refute beyond a reasonable doubt. Four witnesses saw appellant's course of physical assault upon these unfortunates; one of those saw him take the victims out of the apartment. No one saw the victims alive after they left the apartment. The evidence overwhelmingly refutes the conclusion that appellant would have us draw from one isolated, indirect comment made by an unidentified informant not, himself, present at the trial. The jury thus could reasonably have found either that appellant acted alone or in concert with other gang members in the murder of Roman Turcios.

We overrule appellant's last four grounds of error and affirm the judgment of the trial court.